

# In the Missouri Court of Appeals
## Eastern District

### DIVISION TWO

| | | |
|---|---|---|
| ROBERT INGHAM, ET AL., | ) | No. ED107476 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Rex M. Burlison |
| JOHNSON & JOHNSON, ET AL., | ) | |
| | ) | |
| Appellant. | ) | Filed: June 23, 2020 |

### Introduction

Johnson & Johnson ("J&J") and Johnson & Johnson Consumer Companies Inc. ("JJCI") (collectively, "Defendants") appeal the trial court's judgment after a jury verdict for Gail L. Ingham and twenty-one other plaintiffs (collectively, "Plaintiffs")[1] on their product liability claims. Defendants bring ten points on appeal. In their first point, Defendants argue the trial court erred in denying their motion for severance. In their second point, Defendants argue the trial court erred in overruling their objection to a statement made by Plaintiffs' counsel during closing argument. In their third point, Defendants argue the trial court erred in finding they were subject to personal jurisdiction in Missouri on the claims of those Plaintiffs not residing in Missouri. In their fourth through seventh points, Defendants challenge the admissibility of

---

[1] Plaintiffs' Petition initially named eighty-two plaintiffs, including spouses of the other named Plaintiffs. Only twenty-two plaintiffs and their spouses proceeded to trial.

various expert testimony. In their eighth point, Defendants argue the trial court erred in denying their motion for directed verdict because Plaintiffs failed to make a submissible case for causation. In their ninth point, Defendants argue the trial court erred in denying their motion for directed verdict because Plaintiffs failed to make a submissible case for punitive damages. Last, Defendants argue the trial court erred in denying their motion to vacate or remit the jury's punitive damages award. We reverse the trial court's judgment in part, and affirm the trial court's judgment as modified under Rule 84.14.[2]

**Factual and Procedural Background**

JJCI manufactures and sells products containing talcum powder ("talc"), a mineral used in cosmetics, across the United States. J&J is JJCI's parent company. Defendants are both incorporated and headquartered in New Jersey. Plaintiffs filed a petition ("Petition")[3] against Defendants in St. Louis City Circuit Court, alleging claims for strict liability, negligence, and other torts. Plaintiffs' Petition alleged they developed ovarian cancer after continued use of two of Defendants' talc products: Johnson's Baby Powder ("Johnson's Baby Powder") and Shower to Shower, including any variation, modification, or extension such as Shower to Shower Shimmer Effects ("Shimmer") and Shower to Shower Sport (collectively, "Products"). Plaintiffs allege Defendants knew for decades their Products contained asbestos fibers and other dangerous carcinogens but persisted in producing and marketing the Products despite the dangerous health hazards they posed. Plaintiffs allege Defendants mounted a concerted effort to avoid warning government regulators and public health officials, the scientific and medical community, and the public of the contents of the Products. Plaintiffs sought compensatory and punitive damages.

---

[2] All rule references are to the Missouri Supreme Court Rules (2018).

[3] All references to the Petition are to Plaintiffs' Third Amended Petition.

Seventeen Plaintiffs lived, purchased Defendants' Products, used Defendants' Products, and developed ovarian cancer outside Missouri (collectively, the "Non-Resident Plaintiffs"). Five Plaintiffs lived, purchased Defendants' Products, used Defendants' Products, and developed ovarian cancer in Missouri (collectively, the "Missouri Plaintiffs").

Before trial, Defendants moved to dismiss Plaintiffs' Petition for lack of personal jurisdiction over the Non-Resident Plaintiffs' claims.[4] Defendants asserted there is no general jurisdiction over Defendants in Missouri because they are incorporated and headquartered in New Jersey. Defendants asserted there is no specific jurisdiction over them in Missouri on the Non-Resident Plaintiffs' claims because the Non-Resident Plaintiffs "reside[d] outside of Missouri, purchased and used [Defendants'] products outside of Missouri, and 'developed' ovarian cancer outside of Missouri."

In their Petition, Plaintiffs alleged Defendants were subject to specific jurisdiction on their claims because JJCI had two long-term contractual relationships with Pharma Tech Industries, which is headquartered in Missouri. Plaintiffs alleged one contractual relationship involved the manufacturing, packaging, and supply of Shimmer and the other involved the manufacturing, packaging, and supply of Johnson's Baby Powder.[5] Plaintiffs argued Pharma Tech Industries engaged in manufacturing, packaging, and supply activities relating to the Products in Missouri "at . . . Defendants' direction and under [their] control." Specifically,

---

[4] Defendants did not challenge personal jurisdiction as to the Missouri Plaintiffs in the trial court and do not challenge personal jurisdiction as to the Missouri Plaintiffs on appeal.

[5] The Non-Resident Plaintiffs initially argued Missouri had specific jurisdiction over Defendants regarding their claims because they joined an action with the Missouri Plaintiffs. However, while this case was pending, that theory was rejected by the United States Supreme Court in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1781 (2017), which held each individual out-of-state plaintiff in an action must demonstrate "a connection between the forum and the specific claims at issue." This Court has confirmed that, after *Bristol-Myers*, out-of-state plaintiffs in talc cases cannot sue defendants in Missouri solely by joining their causes of action with in-state plaintiffs. *See Estate of Fox v. Johnson & Johnson*, 539 S.W.3d 48 (Mo. App. E.D. 2017) and *Ristesund v. Johnson & Johnson*, 558 S.W.3d 77 (Mo. App. E.D. 2018).

3

fifteen Non-Resident Plaintiffs argued specific jurisdiction over Defendants on their claims was proper because they used Shimmer, which was manufactured, labeled, and packaged by Pharma Tech Industries' sister company, known as Pharma Tech Union, in Union, Missouri, under Defendants' direction and control. The remaining two Non-Resident Plaintiffs[6] argued specific jurisdiction over Defendants on their claims was proper because they used Johnson's Baby Powder, which was manufactured, labeled, and packaged by Pharma Tech Industries' sister company, known as Pharma Tech Royston, in Royston, Georgia, under Pharma Tech Industries' direction and control. In addition, all Non-Resident Plaintiffs argued Defendants were subject to specific jurisdiction because Defendants' marketing strategy for the Products was created, in part, in St. Louis City, and marketing, advertising, distribution, and sale of the Products took place in Missouri.[7]

The trial court denied Defendants' motion to dismiss and held that specific jurisdiction existed over Defendants on the Non-Resident Plaintiffs' claims. The trial court found Defendants' alleged conduct satisfied Missouri's long-arm statute because Defendants transacted business in Missouri, allegedly committed tortious conduct in Missouri, owned real estate in Missouri, and contracted with Missouri-based Pharma Tech Industries to manufacture packaging materials. The trial court further found Defendants contracted with Missouri-based Pharma Tech

---

[6] The two Non-Resident Plaintiffs who testified they did not use Shimmer and only used Johnson's Baby Powder are Annette Koman and Marcia Owens. A Suggestion of Death and Motion for Substitution was filed on Annette Koman's behalf during the pendency of this appeal. Allan Koman, her surviving husband and the administrator of her estate, was substituted in her place.

[7] The Non-Resident Plaintiffs also argued the following acts served as bases for personal jurisdiction: Defendants interviewed adult women who used Johnson's Baby Powder in St. Louis, Missouri; Defendants tested the sale of their Products on an endcap at a K-Mart store in St. Louis, Missouri; Defendants entered agreements with an organization based in St. Louis, Missouri to sell Johnson's Baby Powder to hospitals and health agencies across the nation; Defendants contributed to Missouri political candidates; and Defendants coordinated with the U.S. Chamber Institute for Legal Reform to engage in lobbying efforts in Missouri. Plaintiffs do not assert their claims arise out of or relate to any of these alleged activities. Thus, these alleged activities cannot serve as a basis for exercising personal jurisdiction over Defendants. *See Bristol-Myers*, 137 S. Ct. at 1781.

Industries to manufacture, label, and package the Products and Pharma Tech Industries' relevant actions were under the direction and control of Defendants.

Although Defendants relied on *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017) to argue they were not subject to specific jurisdiction in Missouri, the trial court found *Bristol-Myers* distinguishable. In *Bristol-Myers*, the United States Supreme Court found the sale of a drug that injured plaintiffs in California did not confer jurisdiction over plaintiffs injured in other states where the defendant "did not develop [the drug] in California, did not create a marketing strategy for [the drug] in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California." The trial court found "Plaintiffs allege[d] that Defendants engaged in all of these activities in Missouri except working on regulatory approval." The trial court found these activities constituted sufficient minimum contacts to subject Defendants to specific jurisdiction in Missouri on the Non-Resident Plaintiffs' claims.

Defendants also argued the trial court should sever Plaintiffs' claims because they had numerous differences: e.g., all Plaintiffs were different ages when they developed ovarian cancer, had different medical histories, were from different states, and used the Products at different ages and during different time periods. Defendants argued these differences precluded Plaintiffs' claims from arising from the same transaction or occurrence. The trial court denied Defendants' motion to sever, holding Plaintiffs' claims against Defendants "ar[o]se out of the same basic injuries, same defect, same alleged duty, and same causes of action." The trial court also found "[t]he alleged events for which Plaintiffs s[ought] damages ar[o]se out of the same common scheme or design[;] . . . [we]re connected with a common core, common purpose, or common event[;]" and had common questions of law and fact.

Plaintiffs proceeded to trial on May 31, 2018. After hearing testimony from over thirty witnesses over six weeks, the jury returned a verdict finding Defendants liable on all claims. The jury awarded each individual Plaintiff $25 million in compensatory damages, totaling $550 million, with judgment entered jointly and severally against Defendants. The jury awarded $4.14 billion in punitive damages, with J&J responsible for $3.15 billion and JJCI responsible for $990 million. Defendants filed several post-judgment motions, which were denied by the trial court.

Defendants now appeal. Additional facts will be included below as we address Defendants' ten points of error.

## Discussion

*Point I: Denial of Defendants' Motion to Sever*

Defendants' first point argues the trial court's denial of their motion to sever Plaintiffs' claims was erroneous because each Plaintiff "had her own set of risk factors, diagnoses and health outcomes; . . . her own distinct history of exposure to Powders sourced from different mines around the globe; and . . . faced different defenses, in many cases under the laws of different states (12 in all)." They argue the trial court's denial of their motion to sever Plaintiffs' claims into separate and distinct trials prejudiced them because the ruling allowed Plaintiffs to:

(1) evade their burden of providing that the Powders caused each one's cancer;

(2) obscure the weaknesses in each Plaintiff's individual case by presenting the jury with a confusing jumble of facts regarding the separate claims of nearly two dozen Plaintiffs; and

(3) blur important differences in the varying laws and defenses applicable to each Plaintiff's claims.

Defendants argue the trial court was required, under Rule 52.05(b),[8] to order separate trials and prevent this alleged prejudice.

## Standard of Review

"Appellate courts review the circuit court's ruling on a motion to sever for an abuse of discretion." *State ex rel. Johnson & Johnson v. Burlison*, 567 S.W.3d 168, 178 (Mo. banc 2019) (Draper, J., dissenting) (citing *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 395 (Mo. banc 1987)). An abuse of discretion only occurs when the trial court's ruling is "'clearly against the logic of the circumstances' and 'so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Stephenson v. Countryside Townhomes, LLC*, 437 S.W.3d 380, 389 (Mo. App. E.D. 2014) (quoting *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 (Mo. banc 2010)). However, Rule 84.13(b) provides: "No appellate court shall reverse any judgment unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action." Therefore, "[e]ven assuming the circuit court erred by . . . failing to sever . . . claims, an error does not warrant reversal on appeal unless the error results in prejudice." *Barron v. Abbott Labs., Inc.*, 529 S.W.3d 795, 798 (Mo. banc 2017) (citations omitted).

---

[8] We note Defendants' brief on appeal conflates the terms "separate" and "sever." Defendants' motion below requested the trial court "*sever* Plaintiffs' claims into distinct and separate actions." (emphasis added). However, Defendants' brief on appeal relies on Rule 52.05(b), which allows the trial court to "order *separate* trials or make other orders to prevent delay or prejudice," and requests that our Court "remand for new, *separate* trials." (emphasis added). "[D]esignating a claim for separate trial is distinguishable from severance, despite these terms being used interchangeably." *See State ex rel. Johnson & Johnson v. Burlison*, 567 S.W.3d 168, 178 (Mo. banc 2019) (Draper, J., dissenting). "Rule 52.06 severance creates totally separate claims to be pursued in independent actions and resulting in completely separate judgments," while "[s]eparate trials . . . remain part of a single legal action with a single judgment to be entered thereon." *Distefano v. Quigley*, 230 S.W.3d 647, 648 (Mo. App. S.D. 2007) (citing STEVEN KATZ, 16 MISSOURI PRACTICE, CIVIL RULES PRACTICE § 66.02-2 (2d ed. 1998)). Because Defendants' motions before the trial court were motions for *severance*, we will treat their claim on appeal as one that the trial court erred in denying their requests to sever Plaintiffs' claims, not to order separate trials on Plaintiffs' claims.

7

"Appellate review of claims of improper joinder and failure to sever involves a two-step analysis." *State v. Hood*, 451 S.W.3d 758, 762 (Mo. App. E.D. 2014) (citing *State v. Chambers*, 234 S.W.3d 501, 508 (Mo. App. E.D. 2007)). "First, we must determine whether joinder was proper as a matter of law." *Id.* "If joinder was proper, we must next determine whether the court abused its discretion in denying the defendant's motion to sever." *Id.* A challenge to *only* the trial court's decision not to sever claims "presupposes proper joinder." *Id.*

Defendants' first point does not challenge Plaintiffs' claims were improperly joined. But joinder of Plaintiffs' claims was proper. "[T]he policy of the law is to try all issues arising out of the same occurrence or series of occurrences together." *Bryan v. Peppers*, 175 S.W.3d 714, 719 (Mo. App. S.D. 2005) (internal quotations and citations omitted). Missouri courts have adopted a "broad policy favoring permissive joinder." *State ex rel. Allen v. Barker*, 581 S.W.2d 818, 827 (Mo. banc 1979). Missouri Supreme Court Rule 52.05(a)[9] permits multiple plaintiffs to join their claims in a single petition "if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action." All that is necessary to be properly joined under Missouri law is the claims be "factually and legally interrelated"; "the plaintiffs' claims need not be *identical* to one another." *McGuire v. Kenoma, LLC*, 375 S.W.3d 157, 189 (Mo. App. W.D. 2012) (alteration in original) (footnote omitted).

Certainly, Plaintiffs' claims are not identical. As Defendants' brief describes, they have a host of differentiating characteristics. These differences include their genetic dispositions,

---

[9] "Missouri's Rule 52.05(a) is substantially the same as Federal Rule 20(a), and, when 'the Missouri and federal rules are essentially the same, federal precedents constitute persuasive, although not binding, authority.'" *Burlison*, 567 S.W.3d at 189 n.4 (quoting *Hemme v. Bharti*, 183 S.W.3d 593, 597 (Mo. banc 2006)) (Wilson, J., dissenting).

family histories, previous diagnoses, ages when they developed ovarian cancer, types of ovarian cancer, and durations and frequencies of talc use. However, the existence of facts unique to each plaintiff does not preclude joinder. *See Simmons v. Skechers USA, Inc.*, No. 4:15-CV-340-CEJ, 2015 WL 1604859, at *4 (E.D. Mo. Apr. 9, 2015) ("The presence of some unique factual circumstances in each of plaintiffs' claims . . . does not undercut the propriety of joinder."). If it did, joinder "would be precluded in almost any circumstance." *McClellan v. I-Flow Corp.*, Nos. 07-1309-AA, 07-1318-AA, 08-478-AA, 2010 WL 11595942, at *3 (D. Or. July 23, 2010).

Despite Plaintiffs' differentiating characteristics, Plaintiffs' claims against Defendants arose out of the same occurrence: each Plaintiff used Defendants' Products. Their Petition alleged they each developed ovarian cancer because of Defendants' wrongful conduct in manufacturing, marketing, testing, promoting, selling, and distributing the Products. Plaintiffs also asserted the same causes of action against Defendants with the same relevant evidence at issue in all claims. The evidence adduced at trial involved common issues regarding whether talc or asbestos cause cancer, whether the Products contained asbestos, Defendants' testing methodology, whether Defendants knew the Products contained asbestos, and whether Defendants disseminated misleading information regarding the risks of the Products.

Disposal of Plaintiffs' claims in a single trial would save both the parties and the court money, time, and resources. *See State ex rel. Blond v. Stubbs*, 485 S.W.2d 152, 157-58 (Mo. App. 1972); *see also McClellan*, 2010 WL 11595942, at *3 (quoting *In re Montor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2010 WL 797273, at *4 (M.D. Ga. Mar. 3, 2010)) (holding joinder is appropriate where it would allow parties "to obtain results from multiple claims without burdening the [trial c]ourt or parties with the substantial cost of multiple separate

9

trials."). Under the circumstances, the trial court could, in its discretion, order joinder of Plaintiffs' claims under Rule 52.05(a).

Having found joinder was proper under Rule 52.05(a), we must next evaluate whether the trial court abused its discretion when it denied Defendants' request that Plaintiffs' claims be severed. Rule 52.06 states, "Any claim against a party may be severed and proceeded with separately." In deciding whether to sever claims under Rule 52.06, the trial court should consider the "practical difficulties" involved in proceeding with one trial when there are multiple issues, plaintiffs, or defendants. *See Stubbs*, 485 S.W.2d at 157 (footnote omitted). The trial court should also consider convenience, the avoidance of prejudice, judicial economy, and the conflicting interests of the parties. *See Bryan*, 175 S.W.3d at 720-21 (citing *Shady Valley Park & Pool, Inc. v. Fred Weber, Inc.*, 913 S.W.2d 28, 36 (Mo. App. E.D. 1995)). "Th[e]se considerations can and should be taken into account under the authority conferred upon the trial court under Rule 66.02, which authorizes the granting of separate trials of any claim or of any separate issue 'in the furtherance of convenience or to avoid prejudice.'" *Stubbs*, 485 S.W.2d at 157.

Defendants make no arguments regarding convenience or judicial economy and undertake no effort to weigh their interests against those of Plaintiffs. Instead, they advance several arguments they were prejudiced by the trial court's denial of their motion for severance. None of their arguments persuade us the trial court's decision not to sever Plaintiffs' claims was an abuse of discretion.

First, Defendants speculate the jurors were "lost in a jumble of evidence." Defendants argue Plaintiffs' similar awards of $25 million in compensatory damages prove the jury's confusion and failure to "consider any individual plaintiff's claim[ ] on its own merits."

10

Defendants' claim of prejudice in this regard suffers a fatal flaw: it "amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict." *Opper v. United States*, 348 U.S. 84, 95 (1954). We must presume the jury followed the trial court's instruction in reaching its verdict. *Dieser v. St. Anthony's Med. Ctr.*, 498 S.W.3d 419, 435 (Mo. banc 2016). Here, the trial court instructed the jury to consider each Plaintiff's claim on its own merits. The trial court also, in over 140 pages of trial transcript, read the jury instructions for each individual Plaintiff to the jury.

Further, "[I]dentical damages awards, without more, simply are not sufficient evidence of juror confusion." *Eghnayem v. Boston Sci. Corp.*, 873 F.3d 1304, 1315 (11th Cir. 2017). The reasoning behind a jury's verdict is not "open to inquiry or impeachment for faulty logic, misconceived evidence or mistaken calculations. These remain matters which 'rest alone in the juror's breast.'" *See Elam v. Alcolac, Inc.*, 765 S.W.2d 42, 221 (Mo. App. W.D. 1988) (internal quotations omitted). Defendants identify no direct source of the jury's alleged confusion and instead effectively "worked backwards, speculating as to the reason for the compensatory awards based on the end result." *See Eghnayem*, 873 F.3d at 1315 (alteration omitted). Where plaintiffs suffer similar injuries caused by the same product, a jury may reasonably find they are entitled to similar relief. *Id.* Because speculation does not support a finding that any error committed "materially affect[ed] the merits of the action" as required to support reversal under Rule 84.13(b), Defendants' argument they were prejudiced because the jury allegedly failed to consider any individual plaintiff's claims on its own merits is insufficient. *See Nachtweih v. Maravilla*, 861 S.W.2d 164, 169 (Mo. App. E.D. 1993) (holding reversal on the basis that an error "materially affect[ed] the merits of the action" under Rule 84.13 cannot be based on speculation).

11

Second, Defendants argue joinder "permitted [P]laintiffs to evade their causation burden." Defendants argue Plaintiffs' risk factors were "significantly different" and joinder "confused and obscured" those differences, leading the jury to "assum[e] that the Powders must have been the common factor that caused all of [P]laintiffs' diseases." Defendants essentially argue severance was required because each Plaintiff's proof of specific causation was different. However, differences in causation are generally not enough, standing alone, to bar joinder of products liability claims. *See Eghnayem*, 873 F.3d at 1314. Any danger of prejudice arising from joinder despite differences in Plaintiffs' proof of causation was reduced in this case because the trial court instructed the jury, in separate verdict directors, they must find Defendants' Products directly caused or directly contributed to cause each individual Plaintiff's injury. And Plaintiffs presented evidence of specific causation for each individual Plaintiff through their expert, Dr. Felsher. In his differential diagnosis, Dr. Felsher considered and compared the unique risk factors of each individual Plaintiff in detail. He meticulously told the jury about each individual Plaintiff's personal history, opined about which aspects of her history made her more or less at risk for developing ovarian cancer, and concluded talc exposure directly caused or directly contributed to cause her ovarian cancer. The trial court's instructions, and Plaintiffs' presentation of Dr. Felsher's expert testimony, prove joinder did not permit Plaintiffs to "evade [their] causation burden," as Defendants argue.

Third, Defendants argue joinder allowed evidence into trial individually inadmissible for some plaintiffs. For example, Defendants complain Plaintiffs were exposed to the Products in different time periods, but joinder allowed the jury to consider the alleged presence of asbestos in talc over several decades dating "as far back as 1960" where different mines were used to supply talc for the Products. Defendants argue evidence of alleged asbestos in talc from years other

12

than those years an individual Plaintiff used the Products would have been inadmissible if Plaintiffs' cases were tried separately. Defendants also complain the jury heard evidence of "the emotional impact of 22 different [P]laintiffs' stories." They argue evidence of other women's experience with cancer would have been inadmissible if Plaintiffs' cases were tried separately.

We note initially Defendants failed to advance this argument in their motion for severance at the trial court level or in their motion for new trial.[10] "An issue is not properly preserved for appeal when the appellant fails to argue at trial the grounds asserted upon appeal." *State v. Lewis*, 243 S.W.3d 523, 524 (Mo. App. W.D. 2008) (citing *State v. Tisius*, 92 S.W.3d 751, 767 (Mo. banc 2002)). Because "[a]n appellant cannot broaden or change allegations of error on appeal," Defendants' argument that severance was warranted because, without it, some evidence was admitted into trial that would have been inadmissible for some Plaintiffs was not properly preserved. *Id.* Even if their argument could be considered, it would fail. Plaintiffs could have submitted evidence of other women with similar injuries to show the dangerous nature of Defendants' Products in individual trials. The Missouri Supreme Court has held sufficiently similar misconduct, regardless of when it occurred, is relevant in assessing reprehensibility. *See Lewellen v. Franklin*, 441 S.W.3d 136, 147 (Mo. banc 2014). Therefore, evidence that other women were injured by Defendants alleged negligence in manufacturing, packaging, and labeling the Products, despite knowing the Products contained asbestos, may have been admissible to prove Plaintiffs' claims even if their claims were tried individually.

Last, Defendants argue joinder "blurred distinctions in the law and defenses applicable to each [P]laintiff's claim." However, the trial court told the jury the verdict directors for the Non-

---

[10] We also note Defendants failed to request limiting instructions for any evidence they believed would be relevant to one Plaintiffs' claim and not the others. "[W]hen evidence is relevant for some purposes and not others, limiting instructions—not exclusion—are generally the best way to handle the issue." *Eghnayem v. Boston Sci. Corp.*, 873 F.3d 1304, 1316-17 (11th Cir. 2017).

Resident Plaintiffs' claims would instruct on the laws from their respective states, while the verdict directors for the Missouri Plaintiffs' claims would instruct on Missouri law. And the trial court read the instructions for each individual Plaintiff, which included these differences in the law, to the jury in over 140 pages of trial transcript. Because we presume the jury followed the trial court's instruction in reaching its verdict, we are not persuaded differences in the law applicable to each Plaintiff's claims rendered the trial court's decision not to sever Plaintiffs' claims an abuse of discretion. *Dieser*, 498 S.W.3d at 435.

Each of Defendants' arguments ask our Court to make assumptions about how the jury reached their verdict in determining whether the trial court abused its discretion by dismissing their motion to sever Plaintiffs' claims. However, our standard of review does not permit such assumptions to be made. We are compelled to consider only whether the trial court's "ruling is 'clearly against the logic of the circumstances' and 'so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Stephenson*, 437 S.W.3d at 389 (quoting *Mitchell*, 313 S.W.3d at 675).

Although there are obvious differences among Plaintiffs' claims, those claims arose out of a series of occurrences (i.e., using the Products) and at least one common question of law or fact will arise in resolving those claims (e.g., whether Defendants negligently manufactured and produced the Products, whether their testing was deficient, or whether their warnings were inadequate). Any dangers of prejudice arising from joinder were adequately addressed by the trial court's instructions to the jury to consider each Plaintiff's claim separately. The trial court's ruling was neither against the logic of the circumstances nor so arbitrary and unreasonable as to indicate a lack of careful consideration. Accordingly, joinder of Plaintiffs' claims was proper and the trial court's decision to deny Defendants' motion to sever was not an abuse of discretion.

14

Point I is denied.

*Point II: Plaintiffs' Counsel's Statement on Causation During Closing Argument*

Defendants' second point argues the trial court erred by overruling their objection to Plaintiffs' counsel's statement that "but for" causation was "made up" during closing argument. Defendants argue Missouri law requires proof the Products were the "but for" cause of each Plaintiff's injuries. They argue Plaintiffs' counsel's statement that "but for" causation was "made up" was a misstatement of the law, which the trial court had a duty to correct. In Defendants' view, the trial court's failure to do so requires reversal.

Standard of Review

We review the trial court's decision to overrule an objection to a portion of a closing argument for abuse of discretion. *Minze v. Mo. Dep't of Public Safety*, 541 S.W.3d 575, 581 (Mo. App. W.D. 2017). "An abuse of discretion occurs when a defendant is prejudiced such that 'there is a reasonable probability that the outcome at trial would have been different if the error had not been committed.'" *State v. Holmsley*, 554 S.W.3d 406, 410 (Mo. banc 2018) (quoting *State v. Deck*, 303 S.W.3d 527, 540 (Mo. banc 2010)).

Analysis

"Trial courts have wide discretion in controlling closing arguments." *State v. Banks*, 215 S.W.3d 118, 121 (Mo. banc 2007) (quoting *State v. Hahn*, 37 S.W.3d 344, 356 (Mo. App. W.D. 2000)). "Courts accord counsel wide latitude in arguing the facts and in drawing inferences from the evidence, and the law indulges a liberal attitude toward argument, particularly where the comment complained of is fair retort or responds to prior argument of opposing counsel." *Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990) (citing *Lewis v. Bucyrus-Erie*, 622 S.W.2d 920, 925 (Mo. banc 1981)).

15

However, "misstatements of the law are impermissible during closing argument, and a positive and absolute duty . . . rests upon the trial judge to restrain such arguments." *Estate of Overbey by Overbey v. Franklin*, 558 S.W.3d 564, 573 n.10 (Mo. App. W.D. 2018) (alterations omitted). A trial court abuses its discretion in controlling closing argument "when [it] allow[s] plainly unwarranted and injurious arguments." *Banks*, 215 S.W.3d at 121 (quoting *Hahn,* 37 S.W.3d at 356). In ruling on the propriety of argument, the challenged comment "must be interpreted in light of the entire record rather than in isolation." *Dieser*, 498 S.W.3d at 439 (quoting *State ex rel. Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990)).

As Plaintiffs concede in their brief, "the but for causation test is applicable to nearly all tort cases in Missouri." *Thomas v. McKeever's Enters. Inc.*, 388 S.W.3d 206, 212 (Mo. App. W.D. 2012), *overruled on other grounds by* S.B. No. 43, 99th Gen. Assemb., Reg. Sess. (Mo. 2017). "The 'but for' causation test provides that 'the defendant's conduct is *a* cause' of the event if the event would not have occurred 'but for' that conduct. Put simply, 'but for' causation tests for causation in fact." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860-61 (Mo. banc 1993) (emphasis added) (internal quotation and citation omitted). "'But for' is an absolute minimum for causation . . . . [It] dictates that there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought." *Id.* at 862. Importantly, the "but for" standard does not require the defendant's conduct to be the sole or exclusive cause of the injury. *Wagner v. Bondex Int'l, Inc.*, 368 S.W.3d 340, 350-51 (Mo. App. W.D. 2012).

However, "Missouri courts have stated that terms such as 'but for causation' are not to be used when instructing the jury." *Thomas*, 388 S.W.3d at 216. This is "because but for is a test of submissibility, a way of viewing the sufficiency of the evidence, rather than an ultimate

finding to be made by the trier of fact." *Id.* at 212. Therefore, "instructing the jury by use of such terms creates the potential for juror confusion." *Id.* at 216. Missouri Approved Instructions ("MAI") instead instructs the jury using the terms "directly cause" or "directly contribute to cause" without mentioning the phrase "but for causation." *Callahan*, 863 S.W.2d at 863 (citing *MAI 19.01 [1986 Revision] Verdict Directing Modification—Multiple Causes of Damage*).

During closing argument, Defendants' counsel argued that, to find for Plaintiffs, the jury "must rule out alternative causes" and be able to "say to [themselves] if [Plaintiffs] never used Johnson & Johnson's Baby powder would things be different? . . . . That's the question. That's what this but for thing means." During rebuttal closing argument, Plaintiffs' counsel argued to the jury the phrase "but for" would not appear in the trial court's jury instructions and "but for causation" was "made up." Although Plaintiffs' counsel's use of the phrase "made up" to describe "but for causation" lacked eloquence, it was made in response to Defendants' counsel's prior argument suggesting Plaintiffs needed to prove the Products were the sole cause of their injuries. It was within the trial court's wide discretion to allow Plaintiffs' counsel to make such a comment. *See Jackson*, 798 S.W.2d at 704.

Further, according to the MAI, the jury did not have to find that "but for" Defendants' Products, Plaintiffs would not have been injured. Under the MAI, the jury must find Defendants "directly cause[d]" or "directly contribute[d] to cause" Plaintiffs' injuries. Therefore, Plaintiffs' counsel's comment during closing argument tracked the trial court's causation instruction. *Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 857 (Mo. App. W.D. 2013) (citing *Heshion Motors, Inc. v. W. Int'l Hotels*, 600 S.W.2d 526, 534 (Mo. App. W.D. 1980)) ("If a complained of argument during closing is within the purview of a matter to be determined by the jury as it has been instructed, the argument is not a misstatement of the law.").

Even if Plaintiffs' counsel misstated the law, "as long as the trial court properly instructs the jury, we will rarely find reversible error." *Minze*, 541 S.W.3d at 583 (citing *Peterson*, 399 S.W.3d at 861). Defendants do not argue the jury was not provided with the proper law regarding causation. The jury was instructed it must find Defendants' Products "directly caused or directly contributed to cause" Plaintiffs' injuries to return a verdict for Plaintiffs. The trial court read the instructions to the jury, and the written instructions were available to the jury during deliberations. "The jury is bound to follow the trial court's instructions[,] and we presume that it will even to the extent that doing so might require the jury to ignore specific argument of counsel in conflict." *Id.* (alteration in original) (citing *Peterson*, 399 S.W.3d at 861).

Given the entire record, Plaintiffs' counsel's comments were not plainly unwarranted and did not prejudice Defendants. Accordingly, we find the trial court did not abuse its discretion in overruling Defendants' objection to Plaintiffs' counsel's closing argument.

Point II is denied.

*Point III: Personal Jurisdiction*

In their third point, Defendants argue the trial court erroneously determined they were subject to personal jurisdiction in Missouri on the Non-Resident Plaintiffs' claims.

Standard of Review

"[W]hen the issue is whether Missouri courts have personal jurisdiction over a defendant, a reviewing court defers to the fact-finding court with regard to any facts that are essential to that determination." *Pearson v. Koster*, 367 S.W.3d 36, 44 (Mo. banc 2012). "[H]owever, the ultimate question of whether the exercise of jurisdiction meets the standards of the Missouri long-arm statute and the constitution remains a legal question, which is reviewed independently

18

on appeal." *Id.* "When personal jurisdiction is contested, it is the plaintiff who must shoulder the burden of establishing the defendant's contacts with the forum state were sufficient." *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 231 (Mo. banc 2010) (internal quotations omitted).

When presented with a motion to dismiss for lack of personal jurisdiction, "[a] court must consider whether the allegations in the petition, if taken as true, establish facts adequate to invoke personal jurisdiction." *Fulton v. The Bunker Extreme, Inc.*, 343 S.W.3d 9, 12 (Mo. App. S.D. 2011) (citing *Bryant*, 310 S.W.3d at 230-31). "The allegations of the petition are given an intendment most favorable to the existence of the jurisdictional fact." *Good World Deals, LLC. v. Gallagher*, 554 S.W.3d 905, 910 (Mo. App. W.D. 2018) (quoting *Moore v. Christian Fid. Life Ins. Co.*, 687 S.W.2d 210, 211 (Mo. App. W.D. 1984)). In addition to the allegations in the petition, a trial court may also consider "affidavits, oral testimony, and deposition testimony." *Longshore v. Norville*, 93 S.W.3d 746, 751 (Mo. App. E.D. 2002). "The trial court has discretion to believe or disbelieve evidence submitted when deciding the question of personal jurisdiction. However, when determining the issue of personal jurisdiction, the court cannot consider the merits of the underlying action." *Id.*

Analysis

Our evaluation of personal jurisdiction involves a "two-step analysis." *Getz v. TM Salinas, Inc.*, 412 S.W.3d 441, 447 (Mo. App. W.D. 2013) (citing *Bryant*, 310 S.W.3d at 231). First, we must "determine whether the defendant's conduct satisfies Missouri's long-arm statute, Section 506.500, RSMo 2000." *Id.* "If it does, then we next determine whether the defendant has sufficient minimum contacts with Missouri such that asserting personal jurisdiction over the defendant comports with due process." *Id.* (internal quotations omitted). Due process prohibits

courts from exercising personal jurisdiction over a defendant where doing so would offend "traditional notions of fair play and substantial justice." *Bryant*, 310 S.W.3d at 232 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). Here, the trial court found the long-arm statute extends to Defendants, and Defendants do not challenge this finding. Therefore, the sole issue in this appeal is whether the Plaintiffs' Petition sets forth sufficient minimum contacts between Defendants and Missouri to allow the court to exercise personal jurisdiction over them on the Non-Resident Plaintiffs' claims.

"Courts recognize two categories of personal jurisdiction: general and specific." *Ristesund v. Johnson & Johnson*, 558 S.W.3d 77, 80 (Mo. App. E.D. 2018) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 654 U.S. 915, 923-24, 131 S. Ct. 2846, 180 L.Ed.2d 796 (2011)). No Plaintiff asserts the trial court has general personal jurisdiction over Defendants;[11] they argue only that Missouri has specific jurisdiction over Defendants on all their claims. A court may assert specific personal jurisdiction over a defendant "if certain minimum contacts between Missouri and the defendant are established." *Getz*, 412 S.W.3d at 448 (footnote omitted) (quoting *Bryant*, 310 S.W.3d at 232). These factors are "of primary importance" when determining whether a non-resident defendant has sufficient minimum contacts for a Missouri court to have personal jurisdiction: "(1) the nature and the quality of the contact; (2) the quantity of the contacts; [and] (3) the relationship of the cause of action to the contacts." *Weicht v. Suburban Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592, 601 (Mo. App. E.D. 2000) (citing *Schilling v. Human Support Servs.*, 978 S.W.2d 368, 371 (Mo. App.

---

[11] "A court normally can exercise general jurisdiction over a corporation only when the corporation's place of incorporation or its principal place of business is in the forum state." *State ex rel. Key Ins. Co. v. Roldan*, 587 S.W.3d 638, 641 (Mo. banc 2019) (footnote omitted) (quoting *State ex rel. Norfolk S. Ry. Co. v. Dolan*, 512 S.W.3d 41, 45 (Mo. banc 2017)). Here, it is undisputed Defendants are both incorporated and headquartered in New Jersey.

E.D. 1998)). It is "of secondary importance" for the court to consider Missouri's interest in providing a forum for its residents and the convenience or inconvenience to the parties. *Id.*

"When evaluating minimum contacts, the focus is on whether 'there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Getz*, 412 S.W.3d at 448 (quoting *Bryant*, 310 S.W.3d at 232). "It is essential that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *Bryant*, 310 S.W.3d at 236). If sufficient minimum contacts are established, we must also determine "whether jurisdiction over the defendant would comply with traditional notions of fair play and substantial justice" by considering: "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering the fundamental substantive social policies." *Weicht*, 32 S.W.3d at 601 (citing *Schilling*, 978 S.W.2d at 371).

The defendant's minimum contacts with the forum state must also be "adequate[ly] link[ed]" to the plaintiffs' claims. *See Bristol-Myers*, 137 S. Ct. at 1781. Thus, "the specific personal jurisdiction inquiry must be conducted separately for the claims of each individual plaintiff."[12] *Jinright v. Johnson & Johnson, Inc.*, No. 4:17CV01849, 2017 WL 3731317, at *3

---

[12] Specific jurisdiction need not be established for each individual product at issue within a claim in a litigation. *See Carson Optical, Inc. v. RQ Innovasion Inc.*, No. 16-CV-1157, 2020 WL 1516394, at *4 (E.D.N.Y. Mar. 30, 2020). Instead, specific jurisdiction must be established for each *claim* asserted. *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 n.6 (5th Cir. 2006); *see also* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL 3d § 1351, at 299 n.30 (2004) ("[I]f separate claims are pled, specific personal jurisdiction must independently exist for each claim and the existence of personal jurisdiction for one claim will not provide the basis for another claim."). The Petition does not contain an individual claim for each purportedly dangerous Product but, rather, asserts eight causes of action alleging Defendants negligently manufactured a litany of Products, failed to warn consumers of the dangers of those Products, and other torts relating to the manufacture and sale of those Products. It is enough that the Non-Resident Plaintiffs establish their claim arises out of or relates to *at least one* the specific activities alleged in in the Petition. *See Marten v. Godwin*,

21

(Mo. E.D. Aug. 30, 2017). Here, there are two defendants: JJCI and J&J. There are twenty-two plaintiffs in this litigation.

Defendants do not challenge their minimum contacts with Missouri are insufficient as to the claims of the five Missouri Plaintiffs. However, personal jurisdiction over Defendants on the claims of the Missouri Plaintiffs is proper because each of the Missouri Plaintiffs bought the Products, used the Products, developed ovarian cancer, and received treatment for ovarian cancer in Missouri. We do not disturb the trial court's finding of personal jurisdiction over Defendants as to the five Missouri Plaintiffs who purchased and applied the Products in Missouri and developed ovarian cancer in Missouri. *See Weicht*, 32 S.W.3d at 602 (holding that where appellants do not "specifically address the issue of sufficient minimum contacts in their argument . . . [,] appellate review . . . is precluded.").

Defendants only challenge they are subject to personal jurisdiction in Missouri on the claims of the seventeen Non-Resident Plaintiffs. In their Petition, each of the seventeen Non-Resident Plaintiffs claim they purchased and applied the Products in their home states and developed ovarian cancer in their home states because of Defendants' negligent conduct. Specifically, fifteen Non-Resident Plaintiffs testified they used Shimmer and Johnson's Baby Powder. The remaining two Non-Resident Plaintiffs denied they used Shimmer and testified they only used Johnson's Baby Powder. Because there must be an "adequate link" between Defendants' activities in Missouri and the Non-Resident Plaintiffs' claims before imposing specific jurisdiction over Defendants, our analysis is guided by the specific claims asserted by the Non-Resident Plaintiffs against both Defendants. *See Bristol-Myers*, 137 S. Ct. at 1781.

499 F.3d 290, 296 (3d Cir. 2007) (internal citations omitted) (holding specific jurisdiction is proper where "'the defendant . . . purposefully directed his activities' at the forum . . . and the plaintiff's claim . . . 'arise[s] out of or relates to' at least one of those specific activities."). Therefore, specific jurisdiction is proper so long as any part of the Non-Resident Plaintiffs' claims arises from out of or relates to Defendants' activities in Missouri.

Our specific jurisdiction analysis proceeds in two parts. In the first part, we analyze whether JJCI is subject to specific jurisdiction in Missouri on the Non-Resident Plaintiffs' claims. We discuss whether an adequate link exists between: (1) the fifteen Non-Resident Plaintiffs who testified they used Shimmer *and* Johnson's Baby Powder and JJCI's activities in Missouri and (2) the two Non-Resident Plaintiffs who testified they did not use Shimmer and only used Johnson's Baby Powder and JJCI's activities in Missouri. We then analyze whether JJCI's contacts should be imputed to J&J on the Non-Resident Plaintiffs' claims by alter ego or agency principles in the second part.

### Specific Jurisdiction Over JJCI on the Non-Resident Plaintiffs' Claims

JJCI argues the trial court erroneously exercised specific jurisdiction over it in Missouri on the Non-Resident Plaintiffs' claims and improperly based its ruling on Pharma Tech Industries' conduct in Missouri. JJCI argues the "bare fact" it contracted with Pharma Tech Industries to manufacture, label, and package Shimmer and Johnson's Baby Powder is not enough to establish specific jurisdiction over it in Missouri. JJCI argues that, although it contracted with Missouri-based Pharma Tech Industries and Pharma Tech Union manufactured Shimmer in Missouri, no "minimum contacts" exist that justify the trial court's exercise of specific jurisdiction over it in Missouri on fifteen of the Non-Resident Plaintiffs' claims. JJCI argues no minimum contacts exist that justify the trial court's exercise of specific jurisdiction over it in Missouri on the remaining two Non-Resident Plaintiffs' claims because Johnson's Baby Powder was never manufactured in Missouri; Johnson's Baby Powder was solely manufactured, labeled, and packaged by Pharma Tech Royston in Georgia.[13]

---

[13] In addition to these arguments, Defendants also argue the trial court erroneously exercised specific jurisdiction over it because Defendants marketing strategy for the Products was partially created in St. Louis, Missouri, and marketing, advertising, distribution, and sales activities took place in Missouri. Although Plaintiffs argued in their Response in Opposition to Defendants' Renewed Motion to Dismiss 17 Non-Missouri Plaintiffs' Claims for Lack of

Our decision of whether the trial court properly exercised personal jurisdiction over JJCI in Missouri is informed by the United States Supreme Court's decision in *Bristol-Myers*, 137 S. Ct. 1773. In *Bristol-Myers*, over 600 plaintiffs, most of whom were not California residents, sued Bristol-Myers Squibb Co. ("BMS") in California, alleging a drug manufactured by BMS damaged their health. *Id.* at 1777-78. BMS was incorporated in Delaware and headquartered in New York. *Id.* The nonresident plaintiffs did not allege they obtained the drug through California physicians or from any other California source; nor did they claim they were injured by the drug or treated for their injuries in California. *Id.* at 1778. BMS' activities in California included: making approximately one percent of its nationwide sales in California; maintaining five research and laboratory facilities in California; employing around 250 sales representatives in California; and maintaining a small state-government advocacy office in California. *Id.* BMS also contracted with McKesson, a California company, to distribute the drug nationally. *Id.* at 1783.

The United States Supreme Court held there was no specific jurisdiction over BMS in California on the nonresident plaintiffs' claims because their petition alleged no "adequate link between the State and the nonresidents' claims." *Id.* at 1781. The Court emphasized: "the nonresidents were not prescribed [the drug] in California, did not purchase [the drug] in California, did not ingest [the drug] in California, and were not injured by [the drug] in

---

Personal Jurisdiction specific jurisdiction over Defendants may be exercised because of their engagement in marketing research and operations meetings for the Products in Missouri, Plaintiffs do not argue this as a basis for specific jurisdiction on appeal. Regardless, Defendants' sales and marketing activities in Missouri do not provide a sufficient basis to exercise personal jurisdiction over Defendants in Missouri on the Non-Resident Plaintiffs' claims. None of the Non-Resident Plaintiffs alleged they were exposed to or influenced by Defendants marketing in Missouri. Similarly, none of the Non-Resident Plaintiffs alleged they saw or were influenced by any marketing created in Missouri. Defendants' sales and marketing of products in Missouri to resident Plaintiffs is not forum-related conduct that is related to the claims being asserted by the Non-Resident Plaintiffs. *See In re Talc Prod. Liab. Litig.*, No. N17C-03-054, 2018 WL 4340012, at *6 (Del. Super. Ct. Sept. 10, 2018).

California." *Id.* The Court held "[t]he mere fact that *other* plaintiffs were prescribed, obtained, and ingested [the drug] in California—and allegedly sustained the same injuries as did the nonresidents—does not allow [California] to assert specific jurisdiction over the nonresidents' claims." *Id.* (alteration in original). In reaching its conclusion, the Court found it significant that BMS did not develop the drug in California; create a marketing strategy for the drug in California; *or manufacture, label, package*, or work on the regulatory approval of the drug in California. *Id.* at 1778 (emphasis added). The Court also found "[t]he bare fact that [BMS] contracted with a California distributor" did not establish personal jurisdiction over BMS in California because the nonresident plaintiffs did not allege BMS "engaged in relevant acts together with McKesson in California" or BMS was "derivatively liable for McKesson's conduct in California." *Id.* at 1783.

*Fifteen Non-Resident Plaintiffs Claims*

Using *Bristol-Myers* as our guide, we find the trial court properly exercised specific jurisdiction over JJCI on the claims of the fifteen Non-Resident Plaintiffs who testified they used Shimmer. While it is true that, like the nonresident plaintiffs in *Bristol-Myers*, the Non-Resident Plaintiffs here do not assert they purchased, obtained, or used Shimmer in Missouri, the Petition alleged, and the record reveals, JJCI engaged in a host of significant activities in Missouri related to the Non-Resident Plaintiffs' use of Shimmer. JJCI contracted with Missouri-based Pharma Tech Industries to manufacture, package, and label Shimmer. Pharma Tech Industries then manufactured, packaged, and labeled Shimmer at its Pharma Tech Union facility in Missouri according to JJCI's specifications. "[W]here the defendant 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations' between [it]self and residents of the forum, [the defendant] manifestly has availed [it]self of the privilege of

25

conducting business there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985). Accordingly, JJCI's activities relating to the manufacture, packaging, and labeling of Shimmer in Missouri make it reasonable to require it "to submit to the burdens of litigation" in Missouri. *See id.*

JJCI argues that, like the defendant in *Bristol-Myers*, the "bare fact" JJCI contracted with Missouri-based Pharma Tech Industries and Pharma Tech Union then manufactured Shimmer in Missouri does not establish personal jurisdiction over JJCI in Missouri. It argues Pharma Tech Union "merely execute[d] JJCI's specifications, which were all created and issued in New Jersey." JJCI's reliance on *Bristol-Myers* is misplaced. The Court in *Bristol-Myers* concluded "[t]he bare fact that [BMS] contracted with a California distributor" did not establish personal jurisdiction in California because the nonresident plaintiffs did not allege BMS "engaged in relevant acts together with McKesson in California" or was "derivatively liable for McKesson's conduct in California" *and* there was no evidence the drug was manufactured, labeled, or packaged in California. *Id.* Here, the parties concede Shimmer was manufactured, labeled, and packaged according to JJCI's specifications in Missouri. Unlike in *Bristol-Myers*, specific jurisdiction over JJCI is proper because it is based on something more than a mere contractual relationship with a third party.

JJCI also relies on *In re Talc Products Liability Litigation*, No. N17C-03-054, 2018 WL 4340012 (Del. Super. Ct. Sept. 10, 2018) to argue its manufacturing contract with Pharma Tech Industries is insufficient to confer personal jurisdiction over it on the Non-Resident Plaintiffs' claims of Shimmer use in Missouri. However, its reliance on *In re Talc Products Liability Litigation* is also misplaced. In *In re Talc Product Liability Litigation*, the Delaware Superior Court held the fact J&J sent its talc to a company in Delaware for testing was not enough to

establish personal jurisdiction over J&J in Delaware over nonresident plaintiffs' claims that J&J engaged in the "continued production, packaging, marketing, and sale of talc knowing that it was harmful to women." *Id.* at *8. The court found no adequate link existed between J&J's activity of sending its talc to be tested in Delaware and the nonresident plaintiffs' claims, as the nonresident plaintiffs did not allege J&J's testing of talc in Delaware was "a link in the production chain of talc's eventual sale to the public." *Id.* The court found "the fact . . . the situs of the analysis was a lab in Delaware is at best happenstance; it could have been a lab anywhere, and it was not the sort of purposeful availment of the privilege of conducting business in a state that would lead [J&J] to 'reasonably anticipate being hauled into court there.'" *Id.* (footnote omitted).

Here, in contrast, JJCI's contract with Pharma Tech Industries was to manufacture, package, and label Shimmer—and Pharma Tech Union *did* manufacture, package, and label Shimmer in Missouri. The Non-Resident Plaintiffs' claims alleged JJCI negligently manufactured, produced, packaged, and labeled Shimmer. JJCI's activities with Pharma Tech Industries and Pharma Tech Union represent a direct link in the production chain of Shimmer's eventual sale to the public. JJCI's activities with Pharma Tech Industries firmly connect JJCI's activities in Missouri to the specific claims of the Non-Resident Plaintiffs and thus provide an adequate basis to exercise specific jurisdiction over JJCI.

To the extent JJCI challenges specific jurisdiction over it was erroneous because some of the fifteen Non-Resident Plaintiffs had "questionable recollections" of using Shimmer, its argument also fails. Under our standard of review, we must "defer[ ] to the fact-finding court with regard to any facts that are essential" to determining whether personal jurisdiction exists. *Pearson*, 367 S.W.3d at 44. In ruling on Defendants' motion to dismiss for lack of personal

27

jurisdiction, the trial court examined the pleadings and considered the sworn affidavits of all Non-Resident Plaintiffs. It was within the trial court's discretion to believe the affidavits and testimony of the fifteen Non-Resident Plaintiffs they used Shimmer. *See Longshore*, 93 S.W.3d at 754. We must defer to the trial court's fact-finding.

Because sufficient evidence in the record supports that JJCI contracted with Missouri-based Pharma Tech Industries to manufacture, package, and label Shimmer *and* Shimmer was manufactured, packaged, and labeled by Pharma Tech Union in Missouri, and JJCI purposefully availed itself of the privilege of conducting activities within Missouri to establish minimum contacts with the State to satisfy due process, the trial court did not err in overruling Defendants' motion to dismiss for lack of personal jurisdiction over JJCI on these fifteen Non-Resident Plaintiffs' claims.

*Two Non-Resident Plaintiffs' Claims*

We cannot, however, find the trial court properly exercised specific jurisdiction over JJCI on the claims of the two Non-Resident Plaintiffs who testified only that they used Johnson's Baby Powder. The Petition did not sufficiently allege JJCI engaged in significant activities in Missouri related to their use Johnson's Baby Powder.

Two of the Non-Resident Plaintiffs argue the trial court had specific jurisdiction over JJCI on their claims although they denied using Shimmer because they testified they used Johnson's Baby Powder. They maintain JJCI is subject to specific jurisdiction in Missouri because JJCI executed a Manufacturing and Supply Agreement ("MSA") with Missouri-based Pharma Tech Industries to manufacture, package, and label Johnson's Baby Powder. Although Pharma Tech Industries assigned its manufacturing duties on the closing date to Pharma Tech Royston, which is headquartered in Delaware and has its principal place of business in Georgia,

28

the Non-Resident Plaintiffs maintain JJCI is subject to specific jurisdiction in Missouri because Pharma Tech Industries executed two Continuing Unlimited Guaranty Agreements ("Guaranties") guaranteeing Pharma Tech Royston's performance of the production of Johnson's Baby Powder according to the MSA's specifications at JJCI's request and for JJCI's benefit. Beyond the contractual relationships between JJCI and Pharma Tech Industries, the Non-Resident Plaintiffs argue specific jurisdiction over JJCI exists because their Petition alleged Pharma Tech Industries "controlled and directed the manufacturing, processing, bottling, mislabeling, mispackaging, and distributing, without any warnings, of the PRODUCTS at other manufacturing facilities outside of Missouri, including but not limited to its Royston, Georgia manufacturing facility, from its Union, Missouri headquarters."

We find the two Non-Resident Plaintiffs have failed to meet their burden to show specific jurisdiction over JJCI exists on their claims. The record is devoid of evidence that JJCI engaged in any activities related to Johnson's Baby Powder, beyond the executing of the MSA and the Guaranties with a Missouri-based corporation, in Missouri. United States Supreme Court precedent is clear that contracting with an out-of-state party *alone* cannot automatically establish sufficient minimum contacts in the out-of-state party's home forum. *See Burger King Corp.*, 471 U.S. at 478 (alteration in original) ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1783.

Plaintiffs' Petition alleged that Pharma Tech Industries controlled and oversaw Pharma Tech Royston's manufacture of Johnson's Baby Powder from Missouri. However, this allegation lacks support in the record. When determining whether there is personal jurisdiction

29

over a defendant, the trial court "must consider whether the allegations in the petition, if taken as true, establish facts adequate to invoke personal jurisdiction." *Fulton*, 343 S.W.3d at 12. But "[t]he plaintiff's prima facie showing [of personal jurisdiction] must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and oppositions thereto." *Jinright*, 2017 WL 3731317, at *1 (internal quotations omitted). "Bare assertions of jurisdiction are insufficient." *Yaeger v. Wyndham Vacation Resorts, Inc.*, No. 4:14-cv-795-JCH, 2014 WL 3543426, at *3 (E.D. Mo. July 17, 2014).

After JJCI challenged the trial court's personal jurisdiction, the Plaintiffs had an obligation to provide some factual support for the jurisdictional claims made in their Petition and in their briefing on Defendants' motion to dismiss. They have not done so regarding their assertion that Missouri-based Pharma Tech Industries "oversaw, directed and controlled the manufacturing facility in Royston, Georgia." Accordingly, we cannot conclude the trial court properly exercised specific jurisdiction over JJCI on claims of the two Non-Resident Plaintiffs' who testified they did not use Shimmer and only used Johnson's Baby Powder.

Plaintiffs' brief in opposition to Defendants' motion to dismiss asserted "it is clear that [JJCI] directed Pharma Tech in Missouri to oversee and control the [Johnson's Baby Powder] operations" with no exhibit or affidavit to support their argument. Plaintiffs cite only the allegations in their own Petition to support their contention that Pharma Tech Industries oversaw and controlled Pharma Tech Royston from Missouri. Plaintiffs also maintain Pharma Tech Industries' website and promotional videos generally refer to Pharma Tech Royston solely as "Pharma Tech" without distinction from Pharma Tech Union or Pharma Tech Industries, so Pharma Tech Industries must have directed and controlled Pharma Tech Royston. But "[a] corporation is . . . generally not liable for the acts of its sister corporation absent a showing that

30

the sister corporation was an alter ego or acted as an agent." *Douglas v. Imerys Talc Am., Inc.*, No. 4:18CV1141, 2019 WL 626427, at \*7 (quoting *Weston v. Progressive Comm. Holdings, Inc.*, No. 10-980, 2011 WL 231709, at \*2-3 (D. Del. Jan. 24, 2011)). Showing two "companies are somehow affiliated with one another is not sufficient" to demonstrate one company should be liable for the other's acts. *Id.*

In addition, Plaintiffs argue Pharma Tech Industries must have overseen and controlled Pharma Tech Royston's manufacture of Johnson's Baby Powder because, "[o]n at least two occasions, Pharma Tech in Missouri shipped samples of talc and tricalcium phosphate intended for use in the Products to labs 'to be tested per [J&J] micro protocol" and "[t]he testing documents identify two Union, Missouri addresses for Pharma Tech." However, Plaintiffs do not provide support in the record for how the act of Pharma Tech Industries shipping samples of talc for testing to "labs" establishes Pharma Tech Industries specifically oversaw and controlled Pharma Tech Royston's manufacture of Johnson's Baby Powder from Missouri.

Plaintiffs concede neither Pharma Tech Industries nor Pharma Tech Union manufactured, packaged, or labeled Johnson's Baby Powder and Pharma Tech Royston was the sole manufacturer, packager, and labeler of Johnson's Baby Powder.[14] And the record is devoid of evidence Pharma Tech Industries or Pharma Tech Union directed and controlled Pharma Tech Royston's manufacture of Johnson's Baby Powder in Georgia. Plaintiffs did not allege JJCI engaged in acts with Pharma Tech Industries or Pharma Tech Union in Missouri, beyond JJCI's execution of the MSA with a Missouri-based corporation, that were related to Johnson's Baby Powder. Thus, there is insufficient evidence in the record to support JJCI purposefully availed

---

[14] The only Johnson's Baby Powder produced at Pharma Tech Union in Missouri was a pilot batch of Johnson's Baby Powder Cooling Cucumber Melon in 2006, which was never sold and which no Non-Resident Plaintiff alleges they used.

31

itself of the privilege of conducting activities in Missouri to establish minimum contacts with the State to satisfy due process. The trial court erred in overruling Defendants' motion to dismiss for lack of personal jurisdiction over JJCI on the two Non-Resident Plaintiffs' claims.

### Specific Jurisdiction Over J&J on the Non-Resident Plaintiffs' Claims[15]

The parties do not dispute Defendants are separate corporate and legal entities. The parties also agree personal jurisdiction regarding the Non-Resident Plaintiffs' claims over J&J exists only if JJCI's contacts may be properly imputed to J&J via agency or alter ego principles.

*Fifteen Non-Resident Plaintiffs' Claims*

We must first confront whether JJCI's minimum contacts with Missouri, as they relate to the manufacturing, packaging, and labeling of Shimmer, should be imputed to J&J so that specific jurisdiction over J&J exists on the fifteen Non-Resident Plaintiffs' claims.

The requirements of personal jurisdiction "must be met as to each defendant." *Bristol-Myers*, 137 S. Ct. at 1783. "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 118 S. Ct. 1876, 1884 (1998). "[T]wo separate corporations are to be regarded as distinct legal entities, even if the stock of one is owned partly

---

[15] Plaintiffs maintain Defendants "did not adequately present" their argument that specific jurisdiction over J&J was improper to the trial court. Plaintiffs argue Defendants never challenged personal jurisdiction over J&J specifically below and only attempted to distinguish between JJCI and J&J in "eight footnotes in four separate memoranda filed between 2015 and 2018" with no accompanying evidentiary citations and minimal evidence. As such, Plaintiffs argue we should treat Defendants' argument as waived. Based on our review of the record, we find Defendants argued this issue below and the trial court considered the issue of personal jurisdiction over J&J on the Non-Resident Plaintiffs' claims based on the evidence presented. Defendants' memoranda in support of their motion to dismiss for lack of personal jurisdiction emphasized any relevant contractual relationships were solely between JJCI and Pharma Tech Industries. And Defendants specifically raised the issue of personal jurisdiction over J&J on the Non-Resident Plaintiffs' claims at the pre-trial hearing, where they argued:

> [T]here are no allegations of any contracts between the[ Pharma Tech] entities and Johnson & Johnson. The only contracts are contracts between the[ Pharma Tech] entities and JJCI. So the arguments that are made based on the relationship between JJCI and Pharma Tech or PTI Union, or PTI Royston, do not support exercise of jurisdiction with regard to Johnson & Johnson.

or wholly by the other." *Mitchell v. K.C. Stadium Concessions, Inc.*, 865 S.W.2d 779, 784 (Mo. App. W.D. 1993). Even a "close, synergistic relationship" between a parent and subsidiary corporation does not transfer the subsidiary's contacts to the parent for purposes of assessing personal jurisdiction. *Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*, 196 F. Supp. 3d 985, 991 (D. Minn. 2016) (citing *Viasystems, Inc. v. EMB-Pabst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011)). The "parent/subsidiary separation should be 'ignored with caution, and only when the circumstances clearly justify it.'" *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. banc 2013) (quoting *Cent. Cooling & Supply Co. v. Dir. of Revenue, State of Mo.*, 648 S.W.2d 546, 548 (Mo. banc 1982)).

"Courts, both nationwide and in Missouri, recognize two doctrines by which to hold a parent corporation liable for the acts of a subsidiary." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 374 (Mo. App. E.D. 2014). The first is where an alter ego relationship is established between a parent corporation and its subsidiary. *Mid-Mo. Tel. Co. v. Alma Tel. Co.*, 18 S.W.3d 578, 582 (Mo. App. W.D. 2000). The second is where an agency relationship is established between a parent corporation and its subsidiary. *See State ex rel. Ford Motor Co. v. Bacon*, 63 S.W.3d 641, 642 (Mo. banc 2002).

Plaintiffs' brief on appeal primarily argues specific jurisdiction over J&J is proper because the MSA between JJCI and Pharma Tech Industries referenced and "included" J&J. Plaintiffs argue the MSA between JJCI and Pharma Tech Industries renders J&J subject to specific jurisdiction in Missouri because the MSA: imposed "J&J's Responsibility Standards for Suppliers and its Wood Pallet Policy"; indemnified J&J for certain losses; provided "protections for J&J's intellectual property"; and provided J&J would be copied on certain contractual notices. This argument is nothing more than a request to hold J&J liable based on a contract it

did not sign simply because J&J was mentioned within the contract's fine print with no reference to agency or alter ego principles. We cannot hold the trial court properly exercised personal jurisdiction over J&J on this theory. *See Mid-Mo. Tel. Co.*, 18 S.W.3d at 582.

Although not discussed in detail in their brief, Plaintiffs' Petition alleges both that JJCI acted as an agent on behalf of J&J and J&J and JJCI were alter egos.[16] To determine whether Plaintiffs sufficiently pled facts to support either or both of these theories, we must consider Missouri's requirements for establishing an alter ego relationship and an agency relationship.[17]

Courts will find an alter ego relationship exists between a parent corporation and its subsidiary if the "parent corporation completely dominates its subsidiary, and has created or is using the subsidiary for some improper purpose." *Blanks*, 450 S.W.3d at 377 (citing *Camelot Carpets, Ltd. v. Metro Distrib. Co.*, 607 S.W.2d 746, 750 (Mo. App. E.D. 1980)). This "alter ego" concept is commonly called "piercing the corporate veil." *Id.* at 377. To pierce the corporate veil, a plaintiff must prove these three elements:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff s legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

---

[16] Plaintiffs dedicated a little over one page of their 165-page brief to the argument that specific jurisdiction over J&J is proper because "J&J and JJCI held themselves out as one and the same." They argued personal jurisdiction was proper on this ground because J&J was mentioned in several documents between JJCI and Pharma Tech Industries.

[17] For a thorough explanation of the distinctions between the "alter ego" theory and the "agency" theory, see *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375-83 (Mo. App. E.D. 2014).

*Id.* at 375–76. When piercing the corporate veil, "courts set aside and ignore the subsidiary's corporate entity to hold the parent liable." *Id.* at 380. "All activities—and liabilities—of the subsidiary become those of the parent." *Id.*

"The agency theory differs from piercing the corporate veil in theory and operation." *Id.* at 379. "Under an agency theory, the court attributes specific acts to the parent corporation, as principal, because of the parent's authorization of those acts." *Id.* "When legal liability is predicated on principles of agency, courts do not ignore or set aside the existence and entity of the subsidiary. Rather the separate corporate identity of the subsidiary is affirmed, and the two corporations remain distinct entities." *Id.* (internal citations omitted). "To establish agency, evidence must support a finding that the principal has consented to the agents acting on the principal's behalf, and the agent must be subject to the principal's control." *Hefner v. Dausmann*, 996 S.W.2d 660, 664 (Mo. App. S.D. 1999) (citing *Wray v. Samuel U. Rodgers' Cmt'y Health Ctr., Inc.*, 901 S.W.2d 167, 170 (Mo. App. W.D. 1995)). However, domination and control alone does not establish agency. *See Blanks*, 450 S.W.3d at 380-81. The "essential elements" of an agency relationship are:

1) that an agent holds a power to alter legal relations between the principal and a third party;

2) that an agent is a fiduciary with respect to matters within the scope of the agency; [and]

3) that a principal has the right to control the conduct of the agent with respect to matters entrusted to the agent . . . .

*Id.* at 382-83 (alteration in original) (quoting *Bacon*, 63 S.W.3d at 642).

During oral argument, Plaintiffs conceded personal jurisdiction over J&J could only be justified on an agency theory, waiving their reliance on an alter ego theory. Even if Plaintiffs had not conceded this issue, Plaintiffs' allegation that Defendants were alter egos would fail.

35

Plaintiffs failed to plead facts alleging J&J should be held liable for the acts of JJCI as an alter ego. Plaintiffs' allegations focus entirely on JJCI's relationship with J&J and J&J's level of control over JJCI. However, "Even [if] corporations are related and one has complete control over the other, there can be no piercing of the corporate veil without a showing of impropriety in the establishment or use of the corporate form sought to be disregarded." *Blanks*, 450 S.W.3d at 376. Plaintiffs pled no impropriety in J&J's establishment of or use of JJCI and no such evidence was adduced at trial. Therefore, we cannot impute the activities of JJCI to J&J for jurisdictional purposes on an alter ego theory.

Plaintiffs' argument that an agency relationship existed between Defendants fairs no better. The Petition includes these allegations regarding the relationship between Defendants:

- J&J "formulates and coordinates the global strategy for the 'Johnson & Johnson Family of Companies,' including [JJCI], and maintains central corporate policies requiring [JJCI] to act under the general guidance of [J&J]."

- J&J exercised an "unusually high degree of control" over JJCI's manufacturing, marketing, testing, promoting, selling, and/or distributing of the Products.

- J&J "maintains a reporting relationship with [JJCI] that is not defined by a legal, corporate relationship, but in fact crosses that corporate line."

- J&J "directed [JJCI] how it was to handle product safety communication between [JJCI] and the scientific community and consumers at large as to the hazard the PRODUCTS pose to women with respect to development of ovarian cancer."

- J&J "maintains a central global finance function that governs the entire Johnson & Johnson Family of Companies, to include [JJCI], such that [JJCI] does not function independently but under [J&J]'s umbrella."

These allegations suggest J&J exerted a high level of control over JJCI's activities. However, they are nothing more than bare assertions unsupported by the record. Plaintiffs submitted no exhibits, affidavits, or other evidence regarding J&J's alleged domination and control over JJCI with their briefs opposing Defendants' motion to dismiss for lack of personal

jurisdiction.  Such "[b]are assertions of jurisdiction are insufficient" to establish personal jurisdiction.  *Yaeger*, 2014 WL 3543426, at *3.  In addition, even if Plaintiffs sufficiently established J&J exerted a high level of control over JJCI's activities in the record, their Petition wholly failed to allege the first and second elements of agency: that JJCI holds a power to alter legal relations between J&J and third parties and that JJCI is a fiduciary for J&J on any matters.  This failure is fatal to their claim.

Plaintiffs failed to plead and prove all elements of agency.  Therefore, we cannot impute the activities of JJCI to J&J for jurisdictional purposes on an agency theory.  The circumstances in this case do not clearly justify ignoring the distinction between parent/subsidiary and holding J&J liable for JJCI's acts.  We find the trial court erred in overruling Defendants' motion to dismiss for lack of personal jurisdiction as to J&J on the fifteen Non-Resident Plaintiffs' claims.

*Two Non-Resident Plaintiffs' Claims*

Because we find JJCI lacked minimum contacts with Missouri relating to the claims of the two Non-Resident Plaintiffs' who denied using Shimmer and testified they only used Johnson's Baby Powder, we find J&J also could not have had minimum contacts with Missouri relating to their claims.  Therefore, we find the trial court also erred in overruling Defendants' motion to dismiss for lack of personal jurisdiction as to J&J on the two Non-Resident Plaintiffs' claims.

Point III is granted in part and denied in part.  Because "any judgment entered without personal jurisdiction over a party is void," the trial court's judgment entered against JJCI on the two Non-Resident Plaintiffs' claims and against J&J on all seventeen Non-Resident Plaintiffs' claims is reversed.  *See Focus Bank v. Scott*, 504 S.W.3d 904, 907 (Mo. App. S.D. 2016) (internal quotations omitted).

*Point IV: Dr. Longo's Testimony*

In their fourth point relied on, Defendants argue the trial court abused its discretion in admitting Dr. Longo's testimony because they contend it "rested on insufficient facts and data, was not the product of reliable principles and methods, and did not reliably apply principles and methods to the facts, in violation of section 490.065."[18]

Standard of Review

"The trial court has considerable discretion when admitting evidence." *Jones v. City of Kan. City*, 569 S.W.3d 42, 53 (Mo. App. W.D. 2019), *overruled on other grounds by Wilson v. City of Kan. City*, — S.W.3d—, No. SC 97712, 2020 WL 2392483 (Mo. banc May 12, 2020) (citing *Mansil v. Midwest Emergency Med. Servs., P.C.*, 554 S.W.3d 471, 475 (Mo. App. W.D. 2018)). We review a trial court's decision to admit expert testimony for abuse of discretion. *State v. Rogers*, 529 S.W.3d 906, 910, 917 (Mo. App. E.D. 2017). "An abuse of discretion occurs when the court's ruling is 'clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration.'" *Jones*, 569 S.W.3d at 53 (quoting *Mansil*, 554 S.W.3d at 475). The burden is on the appellant to prove the trial court abused its discretion and prejudice resulted. *Matter of Care & Treatment of Lester Bradley v. State*, 554 S.W.3d 440, 452 (Mo. App. W.D. 2018).

Analysis

The admissibility of expert testimony is governed by section 490.065 as amended by the Missouri Legislature effective August 28, 2017. *State v. Boss*, 577 S.W.3d 509, 517 (Mo. App. W.D. 2019); *State v. Suttles*, 581 S.W.3d 137, 146-47 (Mo. App. E.D. 2019). Since the 2017

---

[18] All statutory references are to RSMo 2017, unless otherwise indicated.

amendment, sections 490.065.2(1)-(2) contain language identical to Federal Rule of Evidence ("FRE") 702 and 703 and provide:

> (1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) The testimony is based on sufficient facts or data;
> >
> > (c) The testimony is the product of reliable principles and methods; and
> >
> > (d) The expert has reliably applied the principles and methods to the facts of the case[.]
>
> (2) An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

*Suttles*, 581 S.W.3d at 146-47 (quoting § 490.065.2(1)-(2)).

Under section 490.065.2, "trial courts must act as gatekeepers to ensure that the testimony sought to be admitted . . . is 'not only relevant, but reliable.'" *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317 (Mo. App. E.D. 2018) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, (1993)). "This Court since has held that because the language of Section 490.065 now mirrors FRE 702 and 703, and because FRE 702 and 703 are interpreted under *Daubert* and its progeny, the cases interpreting those federal rules remain relevant and useful in guiding our interpretation of Section 490.065." *Suttles*, 581 S.W.3d at 147 (citing *Jones*, 569 S.W.3d at 54). "Several federal circuits boil the gatekeeping function of trial courts under [FRE] 702 down to its essence in a useful three-part test: (1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable."

*Wright*, 562 S.W.3d at 319 (collecting cases). Missouri courts have borrowed this three-part test to determine the admissibility of expert testimony. *See id.*; *Jones*, 569 S.W.3d at 54.

Defendants' point on appeal challenges only the reliability of Dr. Longo's testimony. "[R]eliability, under section 490.065.2, is determined by many factors," including those set out in *Daubert*. *Boss*, 577 S.W.3d at 517. The *Daubert* factors allow courts to consider the following when determining if an expert's testimony is reliable:

> (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential error rate of the technique or theory when applied and the existence and maintenance of standards and controls; and (4) whether the technique or theory has been generally accepted in the scientific community.

*Id.* (citing *Daubert*, 509 U.S. at 593-94, 113 S. Ct. 2786). "Although [section] 490.065.2 is patterned after [FRE] 702, and the Supreme Court of the United States interpreted [FRE] 702 in *Daubert*, this Court has held that 'the *Daubert* factors themselves are not controlling' in applying [section] 490.065." *State v. Marshall*, 596 S.W.3d 156, 160 (Mo. App. W.D. 2020) (quoting *Suttles*, 581 S.W.3d at 147). The admissibility inquiry is flexible and "other factors may also be relevant." *Wright*, 562 S.W.3d at 318. "[N]o single factor is necessarily dispositive of the reliability of a particular expert's testimony." *Id.*

Defendants contend Dr. Longo's testimony was unreliable because: (1) his conclusion that Johnson's Baby Powder contained asbestos was based on his testing of previously opened, "secondhand" samples dating back to the 1930s and 1940s and (2) his conclusion that Plaintiffs were exposed to high levels of asbestos was based on improper extrapolations from a videotaped simulation in which an "extreme outlier" sample of Johnson's Baby Powder was used. We address each of Defendants' arguments.

**Johnson's Baby Powder Bottle Samples**

At trial, Plaintiffs' expert Dr. Longo testified he sampled thirty-six bottles of Defendants' Products with a transmission electron microscope. Dr. Longo testified about the methods he used to obtain the samples: he purchased one bottle off-the-shelf at a store; one bottle came from the J&J museum; one bottle came from a Plaintiff's home; and the rest were bought by Plaintiffs' lawyers, both from eBay and off-the-shelf at a store, and sent to him. Dr. Longo testified twenty of the thirty-six bottles tested positive for asbestos. In an earlier deposition, Dr. Longo testified none of the bottles sent to him by Plaintiffs' lawyers were sealed and each had been previously opened. He testified he did not know the chain of custody of those bottles before Plaintiffs' lawyers sent them to him.

Defendants challenge the reliability of Dr. Longo's testimony that twenty of the thirty-six bottles of Johnson's Baby Powder tested contained asbestos under section 490.065.2. Defendants complain Dr. Longo's testimony was unreliable because Dr. Longo "had no idea whether the samples he tested consisted of [D]efendants' Powders in their original condition." Defendants argue that, because Dr. Longo's testimony was based on facts and data derived from "secondhand" bottles of Johnson's Baby Powder previously opened, the data underpinning his testimony lacked "reasonable assurance" that the bottles of Johnson's Baby Powder tested were not contaminated or altered after leaving Defendants' control. Defendants argue there were "strong indications" the talc in the bottles tested by Dr. Longo was contaminated or altered, as several of the testing samples contained impurities not associated with manufacturing Johnson's Baby Powder, such as the minerals "richterite" and "diatomaceous earth."

Dr. Longo's testimony is not rendered unreliable under section 490.065.2 because several samples he tested for asbestos were previously opened before they were sent to him. The

41

sufficiency of the facts and data and reliability of the principles and methods Dr. Longo used in concluding the samples of Johnson's Baby Powder he tested contained asbestos were sufficiently established.

In an earlier deposition, Dr. Longo testified he took steps to verify the samples he tested were in fact samples of Johnson's Baby Powder. He testified he performed a "particle size analysis" on a scanning electron microscope "to compare the size distributions of the talc particles as well as any fibrous particles in there as compared to . . . a current version of Johnson's Baby Powder that was bought at a local store." He testified he conducted this analysis to "see how the size particles compared from sample to sample to sample." Dr. Longo found "the particle size distribution was consistent among and between them . . . and consistent with [Defendants'] own particle size specifications." Citing an article by J&J executives, Dr. Longo noted this finding was significant because "particle size of the talc raw material used in . . . products varies widely by product type and by manufacturer." Also in an earlier deposition, Dr. Longo testified he considered whether the thirty-six samples of Johnson's Baby Powder he tested had been contaminated. Dr. Longo stated the caps and lids of the Johnson's Baby Powder he tested could not be removed by hand and there would be observable evidence if the cap or lid had been removed. Dr. Longo concluded none of the samples he analyzed showed any signs of tampering.

"The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Eichacker v. Eichacker*, 596 S.W.3d 177, 185 (Mo. App. E.D. 2020) (citing *Wright*, 562 S.W.3d at 317). "In deciding whether to admit an expert's testimony, the circuit court is required to ensure that all of the statutory factors are met; however the court is not required to consider the degree to which they are met." *Kivland v. Columbia Orthopaedic Grp.,*

42

*LLC*, 331 S.W.3d 299, 311 (Mo. banc 2011). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Wright*, 562 S.W.3d at 318 (quoting *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786). "So long as the expert is qualified, any weakness in the expert's knowledge is for the jury to consider in determining what weight to give the expert." *Kivland*, 331 S.W.3d at 311.

Here, the parties presented the jury with competing theories of whether the Johnson's Baby Powder contained asbestos. Rather than deeming any theory contrary to Defendants' theory unreliable, it was appropriate for the trial court to submit Dr. Longo's expert opinion to the jury. Defendants had plenty of opportunities to highlight possible sources of contamination in the samples of Johnson's Baby Powder Dr. Longo tested during cross-examination. Defendants' challenge to Dr. Longo's use of previously opened samples of Johnson's Baby Powder goes to the weight of his testimony, not its admissibility.

Defendants also urge us to find the trial court abused its discretion in allowing Dr. Longo to testify Johnson's Baby Powder contained asbestos after testing previously opened samples because several other courts have done so when faced with Dr. Longo's or a similar expert's opinion.[19] However, Defendants' assertion that Dr. Longo's testimony must be excluded

---

[19] *See e.g.*, *Fishbain v. Colgate-Palmolive Co.*, No. A-1786-15T2, 2019 WL 4072135, at *9-11 (N.J. App. Aug. 29, 2019) (excluding expert testimony regarding samples of talc obtained from eBay without a reliable chain of custody); *Weirick v. Brenntag N. Am. Inc.*, No. JCCP 4674 (Cal. Super. Ct. July 23, 2018) (order excluding Dr. Longo's testimony regarding samples of talc because the Products he tested "came from multiple sources (clients, collectors, and off-the-shelf purchases by the plaintiff firms) and multiple eras (unknown, 1950s, 1960s, 1970s, 1990s, 2000s, and 2010s)" and plaintiffs "fail[ed] to explain how the samples were stored, repackaged, delivered, etc."); *Nosse v. Arvinmeritor, Inc.*, No. BC603354 (Cal. Super. Ct. June 29, 2016) (in a pre-trial hearing, the trial court stated "it's unreasonable for an expert to rely on the test that was done in a product that cannot be traced back to the product at issue and draw conclusions from the testing on those products that what he tested was indeed the product at issue."); *Barlow v. Colgate-Palmolive Co.*, No. 24X11000783, slip op. at 16-17 (Bal. Cir. Ct. Nov. 13, 2015) ("Given the numerous hands through which these containers pass within the secondary Internet market, the Court finds that it is indeed possible that the eBay samples have been subjected to tampering or altered in some fashion, thereby leaving them in a significantly different condition from the time they were manufactured.").

because other courts have deemed it inadmissible does not persuade us the trial court abused its discretion. Plaintiffs note several other courts have admitted Dr. Longo's testimony about whether Johnson's Baby Powder contains asbestos.[20] "An abuse of discretion will not be found if reasonable minds could differ as to the propriety of the trial court's action." *Bell v. Redjal*, 569 S.W.3d 70, 81 (Mo. App. E.D. 2019) (citing *Koon v. Walden*, 539 S.W.3d 752, 761 (Mo. App. E.D. 2017)). The fact courts across the country do not agree on whether this testimony is admissible is proof that reasonable minds can, and do, differ on this subject.

### Videotaped Simulation and Testimony Regarding Exposure Levels

To demonstrate the level of "dust" in the air that can be generated by using Johnson's Baby Powder, Dr. Longo conducted a videotaped simulation of a man wearing a respirator applying Johnson's Baby Powder to his legs and/or underwear. In the simulation, which lasted five minutes, the man applied Johnson's Baby Powder for a few seconds. The man sat in one place for the remainder of the five minutes, allowing air samples to be gathered. Air filters were then analyzed using standard protocols for determining occupational exposure to airborne asbestos fibers.

The simulation showed the man applying Johnson's Baby Powder under regular lighting and under "Tyndall" lighting, which Dr. Longo described as "high intensity lighting" that shows "invisible[,] small microscopic particles . . . in the air [that] normally you can't see." Dr. Longo testified that, when the simulation was viewed under Tyndall lighting, the jury could see how much "dust" was actually generated from the man's application of Johnson's Baby Powder. Dr.

---

[20] *See e.g.*, *Lanzo v. Cyprus Amax Minerals Co.*, No. L-7385-16AS, at *10 (N.J. Sup. Ct. Dec. 22, 2017) (in a pre-trial hearing, the trial court admitted Dr. Longo's testimony based on sampling of previously opened bottles, finding his testimony "compelling" because he established the "consistency of the product" throughout the samples. The trial court held other issues with his testimony would "go to the weight of the evidence," not admissibility); *Bostic v. 3M Co.*, No. 2017-CP-16-0400, 122, 125 (S.C. Com. Pl. May 11, 2018) (in a pre-trial hearing, the trial court held Dr. Longo's testimony based on previously opened samples of Johnson's Baby Powder was admissible).

Longo explained to the jury that the simulation showed "how the particles of talc get up into the breathing zone, get up into – into your surrounding" even when Johnson's Baby Powder is applied solely below the waist. He testified that, under normal lighting, "[y]ou wouldn't realize you were in this cloud of dust using . . . Johnson['s] Baby Powder."

After the simulation was shown to the jury, Dr. Longo testified the sample of Johnson's Baby Powder used in the simulation was a post-1953 bottle with the highest concentration of asbestos of all the bottles he tested; the bottle had "fifteen million asbestos fibers in bundles per gram," or 630 million total asbestos fibers. Based on the number of asbestos fibers in the high-concentration sample from the simulation, Dr. Longo then testified that a person buying a fourteen-ounce bottle of Johnson's Baby Powder would be exposed to 5.9 billion asbestos fibers. He testified a person buying a twenty-two-ounce bottle of Johnson's Baby Powder would be exposed to nine billion asbestos fibers.

Defendants advance several reasons why Dr. Longo's simulation and related testimony should have been excluded. However, none have merit. First, Defendants complain the bottle of Johnson's Baby Powder Dr. Longo used in the simulation was an "extreme outlier" that "purportedly had amphibole levels more than 30 times higher than the average Dr. Longo claimed to have found in all the secondhand samples combined." (alterations omitted). But Dr. Longo testified "there was a specific reason [he] used" the post-1953, high-concentration bottle in the simulation. He explained another scientist published a similar, peer-reviewed study of the asbestos levels in cosmetic talc manufactured by Cashmere Bouquet. He testified the Cashmere Bouquet study used a cosmetic talc sample with eighteen million asbestos fibers in bundles per gram. Because Dr. Longo wanted to see if Johnson's Baby Powder "performed the same" as Cashmere Bouquet, he testified used a bottle of Johnson's Baby Powder with "fifteen million

45

asbestos fibers in bundles per gram," or 630 million asbestos fibers, in the simulation. Dr. Longo's reliance on a similar, published, peer-reviewed study when selecting the sample used in the simulation provides the data underlying his testimony with a sufficient indicia of reliability.

Defendants also claim Dr. Longo's testimony that Plaintiffs exposure levels to asbestos were just as high as the man in the simulation were unreliable because Dr. Longo failed to establish a similarity of circumstances and conditions between the simulation and Plaintiffs' real-life use of the Products. "A court may properly admit experimental evidence if the tests were conducted under conditions substantially similar to the actual conditions." *Champeau v. Fruehauf*, 814 F.2d 1271, 1278 (8th Cir. 1987) (quoting *Randall v. Warnaco, Inc.*, 677 F.2d 1226, 1233-34 (8th Cir. 1982)). "Admissibility, however, does not depend on perfect identity between actual and experimental conditions. Ordinarily, dissimilarities affect the weight of the evidence, not its admissibility." *Id.*

The conditions in the simulation were not identical to Plaintiffs' real-life exposures. However, the simulation did not purport to be a recreation of Plaintiffs' exact uses of Johnson's Baby Powder. Instead, it was offered solely to show the level of dust involved in applying Johnson's Baby Powder is "beyond what [a juror] would normally perceive." The trial court instructed the jury accordingly. The trial court instructed the jury to consider the simulation evidence "only with respect to the demonstration of the ability of dust particles to remain airborne" and not "on the issues of how much of the dust depicted is or is not asbestos."

Last, Defendants argue Dr. Longo's video demonstration should have been excluded from evidence because allowing the jury to view it was prejudicial in that "the only effect of presenting the jury with a vivid image of a shirtless man in an oversized gas mask dousing himself in Johnson's Baby Powder was to convey to the jury the very point that was so hotly

contested—that the Powders can kill." However, "[d]emonstrating that a piece of evidence is prejudicial is not enough to warrant exclusion . . . by itself since virtually all evidence presented against a [party] can be considered prejudicial." *United States v. Kapordelis*, 569 F.3d 1291, 1313 (11th Cir. 2009). Rather, exclusion is warranted only when the evidence creates a danger of unfair prejudice, confusion of the issues, or misleading the jury that substantially outweighs the probative value of the evidence. *Still v. Ahnemann*, 984 S.W.2d 568, 575 (Mo. App. W.D. 1999) (citing FED. R. EVID. 403). Defendants concede the video demonstration was relevant. The video was not shocking, confusing, or misleading. "Defendants' arguments regarding the exaggeration of the appearance of dust would be appropriate arguments in challenging the weight of the video." *See Lipson v. On Marine Servs. Co.*, No. C13-1747, 2013 WL 6536923, at *3 (W.D. Wash. Dec. 13, 2013).

Again, Defendants urge us to find the trial court abused its discretion in allowing Dr. Longo to testify Plaintiffs were exposed to high levels of asbestos based on his extrapolations from the simulation because several other courts have excluded the exact video Dr. Longo showed the jury in this case, or a similar one.[21] And, again, Plaintiffs point out other courts have admitted similar experiments conducted by Dr. Longo and the testimony accompanying them.[22] Becasue "[a]n abuse of discretion will not be found if reasonable minds could differ as to the

---

[21] *See, e.g., Herford v. AT&T Corp.*, No. BC646315, at *81 (Cal. Super. Ct. Sept. 27, 2017) (in a pre-trial hearing, the trial court excluded Dr. Longo's video simulation); *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 80-81 (Bankr. W.D.N.C. 2014) (describing Dr. Longo's simulation video study as "pseudo-science at best" because they "were carried out in such a way as to produce the highest results possible and to overdramatize the process."); *Krik v. Crane Co.*, 71 F. Supp. 3d 784, 791 (N.D. Ill. 2014) (excluding Dr. Longo's video simulation because the study "had not been conducted in 'substantially the same conditions' as the alleged exposure."); *Dugas v. 3M Co.*, No. 3:14-cv-1096-J-39JBT, 2016 WL 3946802, at *6 (M.D. Fla. June 21, 2016) (excluding one of Dr. Longo's studies because they were not conducted in "substantially similar" conditions to those the plaintiff encountered and its admission would "invite[ ] a plethora of unfair inferences.").

[22] *See e.g., Lipson v. On Marine Servs. Co.*, No. C13-1747, 2013 WL 6536923, at *2-3 (W.D. Wash. Dec. 13, 2013) (admitting Dr. Longo's video demonstrations using Tyndall lighting and accompanying testimony into evidence because the trial court found doing so would "assist the jury in understanding the evidence and . . . Dr. Longo's opinions [were] relevant and reliable").

propriety of the trial court's action," we cannot find the trial court abused its discretion in admitting Dr. Longo's simulation and related testimony. *Bell*, 569 S.W.3d at 81 (citing *Koon*, 539 S.W.3d at 761).

Dr. Longo's testimony met the standards of reliability under section 490.065.2. We find no error in the trial court's decision to admit his testimony.

Point IV is denied.

*Point V: Dr. Madigan's Testimony*

In their fifth point relied on, Defendants argue the trial court abused its discretion in admitting Dr. Madigan's testimony because they contend it "rested on insufficient fa[c]ts and data, was not the product of reliable principles and methods, and did not reliably apply principles and methods to the facts, in violation of section 490.065."

Standard of Review

"The trial court has considerable discretion when admitting evidence." *Jones*, 569 S.W.3d at 53 (citing *Mansil*, 554 S.W.3d at 475). We review a trial court's decision to admit expert testimony for abuse of discretion. *Rogers*, 529 S.W.3d at 910, 917.

Analysis

At trial, Plaintiffs' expert Dr. Madigan testified on direct-examination that Plaintiffs' counsel asked him to review the samples of Johnson's Baby Powder that Dr. Longo found contained asbestos. Based on Dr. Longo's findings, Dr. Madigan was asked to calculate the statistical probability that a Plaintiff was exposed to asbestos if she was exposed to a certain number of containers in her life (i.e., 20, 50, 100). He testified he "rel[ied] heavily on Dr. Longo's work" in reaching his opinions. When Dr. Madigan prepared his report, Dr. Longo had

tested thirty-three bottles of Johnson's Baby Powder. Of those thirty-three bottles tested, Dr. Longo detected asbestos in nineteen bottles and did not detect asbestos in fourteen bottles.

Based on Dr. Longo's test results, Dr. Madigan testified the statistical probability that a Plaintiff was exposed to asbestos in Johnson's Baby Powder "depends on how many containers [she] w[as] exposed to"; "the more containers [she] w[as] exposed to, the more likely [she] w[as] exposed to asbestos." He testified, "[I]f a [P]laintiff were exposed to 50 containers [of Johnson's Baby Powder], [his] calculations suggest[ ] the probability they were *not* exposed to asbestos is very, very small"; "It's the chance of winning [the] Powerball [lottery] with 10 tickets."[23] (emphasis added). He testified, "If a woman used 50 bottles of [Johnson's Baby Powder], based on [his] assumptions, there's a 99.999999997 percent chance she's exposed to asbestos in that bottle" and the chance she's exposed to asbestos is "basically guaranteed." Dr. Madigan also testified if a Plaintiff were exposed to 100 containers of Johnson's Baby Powder, the odds she was not exposed to asbestos is equivalent to winning the Powerball lottery with just one ticket.

Defendants contend Dr. Madigan's testimony was unreliable because he based his statistical analysis entirely on Dr. Longo's "unreliable" test results. Defendants argue that, even if Dr. Longo's testimony regarding whether there was any asbestos in Johnson's Baby Powder was admissible, Dr. Madigan's expert testimony should have been excluded because he failed to demonstrate Dr. Longo's samples were representative of the Johnson's Baby Powder produced by Defendants over any relevant time period. Defendants suggest neither Dr. Longo nor Dr. Madigan established Dr. Longo's test samples were representative of Johnson's Baby Powder

---

[23] Powerball is a popular American lottery game. The published odds of winning the Powerball jackpot are about one in 292 million. *See* Alicia Adamczyk, CNBC, *These Are the Odds You'll Win Tonight's $350 Million Powerball Jackpot*, June 1, 2019, https://www.cnbc.com/2019/05/31/these-are-the-odds-youll-win-the-350-million-powerball-jackpot.html.

produced by Defendants and instead merely relied on each other to "assume" the samples were representative.

Because we find Dr. Longo's testimony regarding his findings of asbestos in samples of Johnson's Baby Powder was reliable, as further discussed in point four of this opinion, we are not persuaded by Defendants' argument that Dr. Madigan's testimony was unreliable solely because he based his statistical analysis on Dr. Longo's test results. We are similarly not persuaded by Defendants' argument that Dr. Madigan's testimony was unreliable because he failed to demonstrate Dr. Longo's samples were representative samples from which generalizations could be drawn.

"Courts have recognized the need for non-biased, representative sampling in various contexts where experts have attempted to draw generalizable conclusions from limited data." *In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prod. Liab. Litig.*, 214 F. Supp. 3d 478, 492 (D.S.C. 2016). Here, the representativeness of Dr. Longo's samples was established. At trial, Dr. Madigan testified about the representativeness of Dr. Longo's samples. He testified that, although he had "no personal knowledge of whether Dr. Longo had any objective or neutral protocols" in deciding which bottles were sent to Dr. Longo for testing, Dr. Longo's samples "couldn't possibly be biased because there's no way of knowing which one has asbestos and which one doesn't." Dr. Madigan testified he "discussed [representativeness] at length with Dr. Longo," and "the process by which the 33 [bottles] were chosen seemed reasonable."

Dr. Longo's testimony corroborates Madigan's testimony. Dr. Longo testified he tested bottles from the 1930s, '40s, '50s, '60s, and '70s through the early-to-mid 2000s because those were the time frames in which Plaintiffs used Johnson's Baby Powder before developing cancer.

He testified, when selecting samples, he found it most significant that the samples being tested came from the mines used by Defendants during the relevant time periods. Dr. Longo testified he knew the bottles selected for testing were manufactured during those time periods because their containers matched Defendants' manufacturing specifications as they changed over the years.

Dr. Longo also reliably established the samples sent to him were authentic Johnson's Baby Powder. In an earlier deposition, Dr. Longo testified he performed a "particle size analysis" on a scanning electron microscope "to compare the size distributions of the talc particles as well as any fibrous particles in there as compared to . . . a current version of Johnson's Baby Powder that was bought at a local store." He testified he conducted this analysis to "see how the size particles compared from sample to sample to sample." Dr. Longo found "the particle size distribution was consistent among and between them . . . and consistent with [Defendants'] own particle size specifications," verifying the samples he tested were representative of Johnson's Baby Powder. Dr. Longo also testified he considered whether the thirty-six samples of Johnson's Baby Powder he tested had been contaminated. Dr. Longo stated the caps and lids of the Johnson's Baby Powder he tested could not be removed by hand and there would be observable evidence if the cap or lid had been removed. Based on his observations of the samples, Dr. Longo concluded none showed signs of tampering.

The record is devoid of evidence that Dr. Longo selected bottles for testing that he thought would yield a certain result. Any weaknesses in Dr. Longo's testing samples could have been highlighted on cross-examination of him in the same manner Defendants cross-examined Dr. Madigan about the representativeness of Dr. Longo's samples. Notably, Defendants chose not to cross-examine Dr. Longo about the representativeness of his samples or sources of

51

possible contamination. While the burden is on Plaintiffs to show a sampling methodology is reliable, Defendants presented no evidence suggesting the samples selected by Dr. Longo and relied upon by Dr. Madigan lack trustworthiness and are not representative. We conclude Dr. Longo's samples were representative of Johnson's Baby Powder produced in the years Plaintiffs claimed to have used it. Therefore, Dr. Madigan's testimony does not violate section 490.065.

Point V is denied.

*Point VI: Dr. Egilman's Testimony*

In their sixth point, Defendants argue the trial court abused its discretion in admitting Dr. Egilman's testimony because they contend it "rested on insufficient facts and data, was not the product of reliable principles and methods, and did not reliably apply principles and methods to the facts, in violation of section 490.065."

Standard of Review

"The trial court has considerable discretion when admitting evidence." *Jones*, 569 S.W.3d at 53 (citing *Mansil*, 554 S.W.3d at 475). We review a trial court's decision to admit expert testimony for abuse of discretion. *Rogers*, 529 S.W.3d at 910, 917.

Analysis

At trial, Plaintiffs' expert Dr. Egilman testified he examined the amount of asbestos Plaintiffs were exposed to after using Johnson's Baby Powder. Dr. Egilman testified he interviewed each living Plaintiff, or a relative of the deceased Plaintiffs, and gathered histories of their Johnson's Baby Powder use. Based on the results of Dr. Longo's simulation study, and the published, peer-reviewed study of Cashmere Bouquet Dr. Longo also relied upon, Dr. Egilman testified the amount of asbestos dust released during personal use of Johnson's Baby Powder is 1.9 fibers per cubic centimeter of space ("f/cc"). Dr. Egilman testified he relied on the Cashmere

Bouquet study in calculating Plaintiffs' personal use exposures to asbestos because, although the Cashmere Bouquet study involved a competitor's product, "some of the talc in that product came from the same mine as Johnson's Baby Powder mine." Based on a 1972 National Institute for Occupational Safety and Health ("NIOSH") study, which tested Johnson's Baby Powder to estimate asbestos exposures during diapering, and J&J studies that estimated asbestos exposure during diapering, Dr. Egilman testified the amount of asbestos dust released during diapering was 2.2 f/cc for adults and 1.8 f/cc for babies. Using these figures and Plaintiffs' histories, Dr. Egilman calculated the asbestos exposure estimates for Plaintiffs, specifically highlighting the exposure estimates of three Plaintiffs in his trial testimony. Dr. Egilman concluded Plaintiffs' exposures to Johnson's Baby Powder more than doubled their baseline risk of developing ovarian cancer.

Defendants maintain Dr. Egilman's measurements "lacked a reasonable factual basis" for several reasons. However, their arguments are insufficient to render Dr. Egilman's testimony inadmissible. "[Q]uestions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissbility* and should be left for the jury's consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (alterations in original) (internal quotations omitted). The problems Defendants cite with Dr. Egilman's testimony go to the weight of his testimony, not its admissibility.

First, Defendants complain Dr. Egilman's finding that the amount of asbestos dust released during personal use of Johnson's Baby Powder is 1.9 f/cc lacks reliability. Defendants argue the Cashmere Bouquet study provided no reliable basis for Dr. Egilman's measurements because, although that product contained some talc from an Italian mine Defendants used to produce Johnson's Baby Powder, Cashmere Bouquet contained some talc from mines in

53

Montana and North Dakota never used by Defendants to produce Johnson's Baby Powder. However, the fact the Cashmere Bouquet study examined a different product does not render Dr. Egilman's opinion testimony factually baseless. Dr. Egilman testified he consulted the same Cashmere Bouquet study Dr. Longo also consulted when Dr. Longo chose which sample of Johnson's Baby Powder to use during his simulation experiment. Dr. Longo acknowledged Cashmere Bouquet contained a "different type of asbestos" than Johnson's Baby Powder. But Dr. Longo testified the differences in Cashmere Bouquet and Johnson's Baby Powder did not impact the results reached in his simulation study; Dr. Longo testified his simulation study reached "very similar results" to the Cashmere Bouquet study.

Next, Defendants complain Dr. Egilman's finding that the amount of asbestos dust released during use of Johnson's Baby Powder while diapering is 2.2 f/cc for adults and 1.8 f/cc for babies lacks reliability. They complain the 1972 NIOSH study from which he drew those figures was flawed because it did not measure solely the concentration of asbestos in the air; rather, it measured the concentration of all fiber types without distinguishing which fibers were asbestos fibers. This fact alone, however, does not render Dr. Egilman's testimony unreliable and inadmissible. Dr. Egilman explained that, after consulting several studies, his expert opinion was that Johnson's Baby Powder contained asbestos. He further explained that, in his view, whether the 1972 NIOSH study identified fibers specifically as "asbestos" was inconsequential, as the only other possible fiber that could be present in a talc sample is a "talc fiber, which is chemically identical to anthophyllite asbestos and structurally the same."

Last, Defendants complain Dr. Egilman's testimony "contradicted—without any explanation or support—the scientific consensus that perineal talc use has not been shown to cause ovarian cancer." "However, an expert's testimony is not rendered unreliable by opposing

expert testimony that contradicts it, because contradictory fact or opinion evidence merely establishes a fact dispute." *Sanford v. Russell*, 387 F. Supp. 3d 774, 785 (E.D. Mich. May 16, 2019). Indeed, *Daubert* instructs us that "shaky but admissible evidence" should be attacked through "[v]igorous cross-examination" and "presentation of contrary evidence" to the jury. *See id.*; *see also Daubert*, 509 U.S. at 595, 113 S. Ct. at 2786.

Dr. Egilman's testimony on Plaintiffs' asbestos exposure was based on reasonable methodology and was admissible under section 490.065.2. Dr. Egilman considered the scientific literature, discussed the scientific literature, and explained why he believed the studies he relied on were important. The weaknesses Defendants note in Dr. Egilman's testimony are weaknesses Defendants could, and did, attack and highlight to the jury at trial through the cross-examination of Dr. Egilman and the presentation of their own expert witness.

Point VI is denied.

*Point VII: Dr. Felsher's Testimony*

In their seventh point, Defendants argue the trial court abused its discretion in admitting Dr. Felsher's testimony because they contend it "rested on insufficient facts and data, was not the product of reliable principles and methods, and did not reliably apply principles and methods to the facts, in violation of section 490.065."

Standard of Review

"The trial court has considerable discretion when admitting evidence." *Jones*, 569 S.W.3d at 53 (citing *Mansil*, 554 S.W.3d at 475). We review a trial court's decision to admit expert testimony for abuse of discretion. *Rogers*, 529 S.W.3d at 910, 917.

Dr. Felsher conducted a "differential diagnosis" and concluded Plaintiffs' exposure to talc caused their ovarian cancer. "In performing a differential diagnosis, a[n expert] begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The [expert] then 'rules out' the least plausible causes of injury until the most likely cause remains." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). "The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury." *Id.* "[A] medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*." *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1208 (8th Cir. 2000). "Because a differential diagnosis is presumptively admissible, . . . a . . . court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid." *Glastetter*, 252 F.3d at 989. Defendants maintain Dr. Felsher's testimony "did not qualify as a differential diagnosis" because he had no scientifically valid bases for "ruling in" talc as a potential cause of Plaintiffs' ovarian cancer or "ruling out" the other risk factors associated with each Plaintiff. We disagree.

Defendants argue Dr. Felsher improperly "ruled in" talc as a potential cause of Plaintiffs' ovarian cancer based solely on the assumptions that Dr. Longo and Dr. Madigan correctly identified asbestos in Johnson's Baby Powder and Dr. Egilman correctly calculated Plaintiffs' exposures to asbestos from Johnson's Baby Powder. Defendants argue Dr. Felsher's basis for "ruling in" talc as a potential cause of Plaintiffs' ovarian cancer was unreliable because Dr. Longo's, Dr. Madigan's, and Dr. Egilman's testimony was unreliable. However, section 490.65.2(2) authorizes the acceptance of an expert's opinion even though that opinion may be

based on facts or data supplied by a third party, including another expert. *Schreibman v. Zanetti*, 909 S.W.2d 692, 698 (Mo. App. W.D. 1995). The statute provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

§ 490.065.2(2). The fact Dr. Felsher assumed the accuracy of their opinions without checking them is inconsequential because Dr. Longo, Dr. Madigan, and Dr. Egilman each vouched for the reasonableness and accuracy of their tests and opinions, as explained in points four through six above. Dr. Felsher appropriately "ruled in" talc as a potential cause of Plaintiffs' ovarian cancer.

Defendants argue Dr. Felsher failed to "rule out" other potential causes of Plaintiffs' ovarian cancer. They argue Dr. Felsher acknowledged all Plaintiffs had several risk factors for developing ovarian cancer but failed to assess them "in terms of weight" or explain why talc exposure, as opposed to other risk factors, was the most likely cause of their ovarian cancer. "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999). "However, '[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness.'" *Id.* (quoting *Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 156 (3d Cir. 1999)). "The alternative causes suggested by a defendant affect the weight that the jury should give the expert's testimony and not the admissibility of the testimony, unless the expert can offer no explanation for why she has concluded an alternative caused offered by the defendant was not the sole cause." *Id.* at 265 (internal citations, quotations, and alterations omitted).

Here, Dr. Felsher considered other potential causes for Plaintiffs' ovarian cancer. Dr. Felsher testified at length regarding the personal histories of each Plaintiff and their various risk factors for developing ovarian cancer. He admitted certain risk factors, such as genetic mutations, family history of cancer, an endometriosis or polycystic ovarian syndrome diagnosis, being overweight, and using certain medications, increase the risk of developing ovarian cancer. Dr. Felsher acknowledged cancer "can start in a lot of ways." But Dr. Felsher opined exposure to asbestos "can act as gasoline" and cause cancer to "become metastatic[ and] become[] resist[a]nt to therapy." He testified exposure to asbestos aggravates cancer by promoting its spread and halting the body's defense mechanisms. He testified this aggravation occurs because asbestos is a carcinogen that activates mesothelial cells, which cause ovarian cancer to spread from the ovaries to other parts of the body. Dr. Felsher concluded, based on each of the twenty-two Plaintiffs' personal histories, asbestos directly contributed to cause their ovarian cancer.

Perceived faults in an expert's differential diagnosis are matters for cross-examination that do not affect admissibility. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). On cross-examination, Defendants questioned Dr. Felsher about why genetic mutations were not the sole cause of Plaintiffs' ovarian cancer. Dr. Felsher explained severe errors in cell division were unlikely to be the sole cause of a Plaintiff's ovarian cancer because such genetic mutation is "not something that generally happens unless you've done something that makes it much more likely to happen. Like a carcinogen." On cross-examination, Defendants chose not to question Dr. Felsher about why the other negative risk factors, such as family history of cancer, an endometriosis or polycystic ovarian syndrome diagnosis, being overweight, and using certain medications, were not the sole cause of each Plaintiff's ovarian cancer.

Dr. Felsher's testimony made clear that he considered and excluded other potential causes for Plaintiffs' ovarian cancer. Furthermore, on cross-examination, Dr. Felsher explained why he did not believe genetic mutations, alone, accounted for their ovarian cancer. Accordingly, Dr. Felsher's alleged failure to account for all possible alternative causes for Plaintiffs' ovarian cancer did not prohibit the admissibility of his opinion as to causation.

Point VII is denied.

*Point VIII: Substantial Evidence of Causation*

In their eighth point, Defendants argue the trial court erred in overruling their motions for directed verdict and judgment notwithstanding the verdict because Plaintiffs failed to present substantial evidence that Defendants' Products were the cause in fact of their ovarian cancer. Defendants maintain Plaintiffs failed to present substantial evidence that Defendants' Products were the cause in fact of Plaintiffs ovarian cancer because their "general causation theory was contrary to the overwhelming scientific consensus."[24]

Standard of Review

"The standard of review of a trial court's denial of motions for directed verdict and judgment notwithstanding the verdict are treated the same." *Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.*, 168 S.W.3d 488, 495 (Mo. App. E.D. 2005) (citing *Erdman v. Condaire, Inc.*, 97 S.W.3d 85, 88 (Mo. App. E.D. 2002)). We must determine "whether the plaintiff made a submissible case." *Hodges v. City of St. Louis*, 217 S.W.3d 278, 279-80 (Mo. banc 2007) (footnote omitted). "A case can be submitted only if 'each and every fact essential to liability is predicated upon legal and substantial evidence.'" *Guidry v. Charter Comm'ns, Inc.*,

---

[24] Defendants also argue Plaintiffs failed to make a submissible case for causation because, "with the exclusion of Drs. Felsher, Egilman, Longo, and/or Madigan, a jury could not find in [P]laintiffs' favor on the issues of specific and general causation." For the reasons explained in points four through seven of this opinion, the testimony of Drs. Felsher, Egilman, Longo, and Madigan was admissible. Therefore, Defendants' argument, to the extent it hinges on the inadmissibility of those experts' testimony, is moot and will not be further addressed.

269 S.W.3d 520, 527 (Mo. App. E.D. 2008) (quoting *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456 (Mo. banc 2006)). "In determining whether the plaintiff has made a submissible case, we will view the evidence in the light most favorable to the verdict, giving the plaintiff the benefits of all reasonable inferences from the verdict, and disregarding unfavorable evidence." *Id.* (citing *Hodges*, 217 S.W.3d at 280). We will only find the plaintiff has failed to make a submissible case where there is "a complete absence of probative fact to support the jury's conclusion." *Dhyne*, 188 S.W.3d at 457. "A directed verdict is inappropriate 'unless reasonable minds could only find in favor of the defendants.'" *Guidry*, 269 S.W.3d at 527 (quoting *Holtmeier v. Dayani*, 862 S.W.2d 391, 395 (Mo. App. E.D. 1993)).

Analysis

To make a submissible case for negligence, "a plaintiff must show that 'the defendant had a duty to protect him [or her] from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused his [or her] injury." *Poage v. Crane Co.*, 523 S.W.3d 496, 508 (Mo. App. E.D. 2017) (quoting *Strong v. Am. Cyanamid Co.*, 261 S.W.3d 493, 506 (Mo. App. E.D. 2007)). To make a submissible case for strict liability, a plaintiff must show:

> (1) the defendant sold a product in the course of its business; (2) the product was then in a defective condition, unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold.

*Id.* "Under both strict liability and negligence theories, the plaintiff is required to show a causal connection between the defendant's conduct and the plaintiff's injury." *Id.* A prima facie showing of causation requires the plaintiff to show the defendant's conduct was "more probably than not" a cause of injury. *Wagner*, 368 S.W.3d at 350 (quoting *Sill v. Burlington N. R.R.*, 87 S.W.3d 386, 394 (Mo. App. S.D. 2002)). Missouri requires showing two types of causation:

60

causation in fact (or "but for" causation) and "proximate" causation. *Poage*, 523 S.W.3d at 508; *see also Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863, 865 (Mo. banc 1993).

Defendants' eighth point argues Plaintiffs failed to establish Defendants' Products were the cause in fact of their ovarian cancer. Whether Defendants' Products were the "cause in fact" of Plaintiffs' ovarian cancer is a factual question left for the jury. *Poage*, 523 S.W.3d at 508. Under Missouri law, the plaintiff must show the negligence of the defendant "directly cause[d]" or "directly contribute[d] to cause" his or her injury to establish causation in fact. *Poage*, 523 S.W.3d at 508. The plaintiff need not prove the defendant's negligence was "the exclusive cause" of his or her injury. *Wagner*, 368 S.W.3d at 350-51.

Defendants argue there is an absence of probative fact from which a jury could find for Plaintiffs on the issue of causation because there is an "overwhelming body of . . . epidemiological evidence" concluding there is no causal relationship between cosmetic talc and ovarian cancer. Defendants highlight evidence favorable to them and ask us to conclude Plaintiffs failed to make a submissible case of causation because Plaintiffs presented no evidence "refut[ing] or explain[ing]" Defendants' evidence. However, Defendants' argument is fundamentally flawed. First, it ignores our standard of review, which requires us to "view the evidence in the light most favorable to the verdict, giving the plaintiff the benefits of all reasonable inferences from the verdict, and disregarding unfavorable evidence." *Guidry*, 269 S.W.3d at 527. Second, it suggests, without legal support, that the only way Plaintiffs could make a submissible case of causation in fact was by "refut[ing] or explain[ing]" Defendants' evidence.

The evidence, when viewed in the light most favorable to the verdict, reveals Plaintiffs met their burden to establish causation. Plaintiffs presented testimony from several experts that

asbestos causes ovarian cancer and asbestos-containing talc causes ovarian cancer. Plaintiffs' expert Dr. Moline testified asbestos causes or significantly contributes to cause ovarian cancer. She testified asbestos causes ovarian cancer because it is microscopic in size, can travel throughout the bloodstream and the body, and can be found in every organ in the body, including the ovaries. She testified her opinion is consistent with the findings of the International Agency for Research on Cancer ("IARC"), the American Cancer Society, the U.S. Department of Health and Human Services, the Environmental Protection Agency, and the National Cancer Institute. Dr. Moline testified that, if a person uses powder containing asbestos in their perineal region, "it can travel into the peritoneal cavity" and cause ovarian cancer. She testified if talc is "laced . . . with asbestos," the asbestos would be carried along with the talc into the ovaries. Dr. Felsher also testified at length about the role asbestos plays in causing ovarian cancer. He testified asbestos causes cancer cells to become invasive and spread through the inflammation and irritation of the mesothelial cells. He also testified about how asbestos makes cancer more aggressive and therapy-resistant. In addition, Plaintiffs' expert Dr. Rosner testified several scientific studies have reported a "link" between asbestos and ovarian cancer and have associated asbestos and talc-based products.

Plaintiffs also presented testimony from several experts that the talc in Johnson's Baby Powder contained asbestos. In her deposition, Plaintiffs' expert Dr. Blount testified she tested one bottle of Johnson's Baby Powder she purchased off-the-shelf from a store and found it contained asbestos. Dr. Longo similarly testified he tested thirty-six bottles of Johnson's Baby Powder and found twenty bottles contained asbestos. And Dr. Egilman testified there is asbestos in Johnson's Baby Powder after reading nearly 1,400 studies conducted by the FDA, J&J, and several other competitor companies.

Plaintiffs also presented testimony from Dr. Felsher that exposure to asbestos-containing talc from Defendants' Products specifically caused Plaintiffs' ovarian cancer. Dr. Felsher testified at length regarding the personal histories of each Plaintiff and their various risk factors for developing ovarian cancer. He admitted certain risk factors, such as genetic mutations, family history of cancer, an endometriosis or polycystic ovarian syndrome diagnosis, being overweight, and using certain medications, increase the risk of developing ovarian cancer. Dr. Felsher acknowledged cancer "can start in a lot of ways." But Dr. Felsher opined exposure to asbestos "can act as gasoline" and cause cancer to "become metastatic[ and] become[] resist[a]nt to therapy." He testified that, based on each of the twenty-two Plaintiffs' personal histories, asbestos directly contributed to cause their ovarian cancer.

Defendants' attacks on Plaintiffs' expert's testimony regarding causation are simply that their conclusions are "not yet established as fact in the scientific community." *See Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 932 (8th Cir. 2001) (rejecting a defendant's argument that an expert's testimony regarding causation should be excluded because it was "not yet established as fact in the scientific community."). However, Defendants have not shown that any scientific theories or studies indicate talc powders are incapable of causing ovarian cancer. Indeed, they admit in their brief the FDA has opined "a possible association" between cosmetic talc and ovarian cancer "is difficult to dismiss" and the IARC has opined "[p]erineal use of talc-based body powder is possibly carcinogenic."

Defendants could, and did, present their own expert witnesses to counter Plaintiffs' causation theory. "[I]t is common that medical experts often disagree on . . . causation," and "questions of conflicting evidence must be left for the jury's determination." *See Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 976 (8th Cir. 1995). We cannot find there is a complete absence

of probative fact regarding the element of causation. Based on the evidence Plaintiffs adduced at trial, a jury could have reasonably found Defendants' Products caused Plaintiffs' injuries. Plaintiffs made a submissible case for the jury, and the trial court properly denied Defendants' motions for directed verdict and judgment notwithstanding the verdict.

Point VIII is denied.

## IX: Clear and Convincing Evidence Justifying Punitive Damages

In their ninth point, Defendants argue the trial court erred in overruling their motions for directed verdict and judgment notwithstanding the verdict on Plaintiffs' demand for punitive damages. Defendants argue Plaintiffs failed to present clear and convincing evidence that Defendants "knew or had reason to know there was a high degree of probability that their talc causes ovarian cancer" and "improperly influenced" regulators, scientists, and the talc industry. Thus, according to Defendants, punitive damages were unwarranted.

### Standard of Review

"Whether sufficient evidence exists to support an award of punitive damages is a question of law, which we review *de novo*." *Poage*, 523 S.W.3d at 515 (internal quotations omitted). "In reviewing a circuit court's overruling of a motion for directed verdict or judgment notwithstanding the verdict, this Court views the evidence in the light most favorable to the verdict, gives the plaintiff all reasonable inferences, and disregards all contrary evidence and inferences." *Barron*, 529 S.W.3d at 800 (citing *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 95 (Mo. banc 2010)). "Only evidence that tends to support the submission should be considered." *Blanks*, 450 S.W.3d at 401.

Under Missouri law, punitive damages may be submitted to the jury if (1) some element of outrageous conduct is demonstrated that (2) shows the defendant acted with a "willful, wanton or malicious culpable state." *Poage*, 523 S.W.3d at 515. To recover punitive damages, "[u]nder both negligence and strict liability theories, the plaintiff must demonstrate that the defendant showed a complete indifference to or conscious disregard for the safety of others."[25] *Id.* This claim must be proven by clear and convincing evidence. *Blanks*, 450 S.W.3d at 400. "[C]lear and convincing evidence is that which tilts the scales in the affirmative when weighed against the evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Cook v. Polineni*, 967 S.W.2d 687, 690-91 (Mo. App. E.D. 1998) (internal quotations omitted). In determining whether a plaintiff has met his or her burden, a court must consider

> whether the evidence—giving full play to the jury's right to determine credibility, weigh the evidence and draw justifiable inferences of fact—is sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference.

*Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 25 (Mo. App. W.D. 2006) (quoting *Lopez-Vizcaino v. Action Bail Bonds, Inc.*, 3 S.W.3d 891, 893 (Mo. App. W.D. 1999)). Where there are multiple defendants, "[p]unitive damages are to be assessed against each tortfeasor depending, among other facts, upon his degree of culpability." *Heckadon v. CFS Enters., Inc.*, 400 S.W.3d 372, 381

---

[25] In a negligence action, punitive damages may be awarded only if the plaintiff shows the defendant "*knew or had reason to know* a high degree of probability existed that the action would result in injury. *Poage v. Crane Co.*, 523 S.W.3d 496, 515 (Mo. App. E.D. 2017) (emphasis added) (citing *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 164-65 (Mo. App. W.D. 1997)). In a strict liability action, the plaintiff must show "the defendant placed in commerce an unreasonably dangerous product with *actual knowledge* of the product's defect." *Id.* (emphasis added).

n.9 (Mo. App. W.D. 2013) (citing *Taylor v. Compere*, 230 S.W.3d 606, 611 (Mo. App. S.D. 2007)); *Moore v. Shelton*, 694 S.W.2d 500, 501 (Mo. App. S.D. 1985).

Viewing the evidence in the light most favorable to the verdict, we find Plaintiffs proved with convincing clarity that Defendants engaged in outrageous conduct because of an evil motive or reckless indifference. According to Plaintiffs' evidence, Defendants knew the Products, which they referred to internally as their "company trust-mark," "golden egg," and "sacred cow," contained asbestos. In a 1969 memorandum, Defendants acknowledged their Products contained tremolite asbestos and asbestos could be dangerous. Defendants' scientist T.M. Thompson warned that, "until [there is] at least substantial evidence . . . to the effect that the presence of Tremolite in our talc does not produce adverse effects, we should not extend its usage beyond an absolute minimum." Memoranda from the 1970s also reveal Defendants knew the Products contained tremolite asbestos. After Dr. Seymour Lewin, "Consultant to the FDA," reported asbestos in samples of Defendants' Products in 1972, Defendants hired Walter C. McCrone Associates, Inc. ("McCrone") to examine the samples. McCrone confirmed the samples contained tremolite. In 1975, McCrone tested more samples of Defendant's Products for asbestiform minerals and found some contained "rather high" levels of amphibole asbestiform fibers.

In an undated internal letter, Defendants' scientist Bill Ashton noted "[t]here are trace quantities [of tremolite] present . . . . Levels are extremely low but occasionally can be detected optically. *This is not new*." (emphasis added). A 1974 internal report found "extremely low" levels of chrysotile were detected in three samples of Johnson's Baby Powder. A 1973 internal memorandum, discussing one of Defendants' mines, stated:

> We should not rely on the 'Clean Mine' approach as a protective device for Baby
> Powder in the current Asbestos or Asbestos-Form controversy. We believe this

66

mine to be very clean; however, we are also confident that fiber forming or fiber type minerals could be found. The usefulness of the 'Clean Mine' approach for asbestos only is over.

According to Plaintiffs' evidence, Defendants' knowledge of asbestos in the Products continued into the 1980s, 1990s, and well into the 2000s. In 1984, air filters at one of Defendants' mines were tested by the Mine Safety and Health Administration ("MSHA"). MSHA found the air filters contained "5.8% anthophyllite, an asbestiform amphibole." In 1998, an internal letter showed Defendants consulted with Dr. Blount, a PhD mineralogist, who tested a talc sample from Defendants' Vermont mine and alerted Defendants she "believe[d] that Johnson & Johnson's Vermont talc contains trace amounts of asbestos which are well below those specified by OSHA." At trial, Dr. Blount testified Defendants' Products have contained asbestos since the 1970s or earlier. In 2003, Defendants' talc supplier Luzenac America Technical Center reported it detected tremolite in a sample of Defendants' talc. In 2004, Hayward Laboratory also reported a sample of Johnson's Baby Powder contained asbestos. Plaintiffs even produced evidence that Defendants' website initially touted their "talc-based consumer products have always been asbestos free" but was later edited to read their "talc-based products *are* asbestos free" because they admitted they could not "say 'always.'" (emphasis added).

According to Plaintiffs' evidence, Defendants also knew of the potential safety hazards caused by the presence of asbestos in cosmetic talc products. In 1972, FDA representatives, the Cosmetic Talc and Fragrance Association ("CTFA"), J&J, and others attended a meeting to discuss the preliminary results of an analysis of over 100 talc-containing cosmetic products for asbestos contamination. A memorandum summarizing that meeting noted, "There was no disagreement between FDA and industry scientists present at this meeting about the potential

safety hazard that the presence of asbestos in talc containing cosmetic product poses to the consumer." And Defendants' talc supplier Rio Tinto Minerals warned Defendants in the 2000s that, "[b]ecause there is no recognized 'safe' level of exposure to asbestos, the presence of any amount in talc would be a serious problem."

In the 1970s, Defendants addressed several alternative methods that could remove fibers from talc "to better protect [their] powder franchise," including the substitution of cornstarch for talc in the Products. Defendants acknowledged cornstarch, "by its very nature does not contain fibers. Furthermore, it is assimilated by the body." Defendants noted investigating replacing talc with cornstarch should "receive top priority." However, Defendants also noted such a replacement would require them to develop explosion proof facilities and undergo merchandising changes. The other alternative methods discussed by Defendants included improving the flotation technique used to separate talc from asbestos and using a process to remove a large portion of the fine particles found in talc. However, Defendants noted that, under these latter approaches, "no final product will ever be made which will be totally free from respirable particles. We are talking about a significant reduction in fine particle count but not 100% clean-up." In 2008, an internal email revealed Defendants discussed replacing talc with cornstarch in the Products but were reluctant to do so because it would be costly. In an email, one Defendant employee urging the use of cornstarch instead of talc stated:

> Basically, I'm thinking it would be in the brand's best interest to develop a strategy to move out of the baby aisle for our talc product and either create a direct Adult proposition or *simply replace the talc ingredient with cornstarch*. This would align with our Best for Baby charter.
>
> *I understand this is a $70M business in the US alone, unsupported. So any changes are risky.* However, given a number of other ingredient issues we are facing, this seems like an easy fix and win. *I know this will be controversial and we'll need to work hard to justify the cost implications* – I also see great positives

associated with it in our challenge to maintain Mom's trust and deliver on our baby expertise.

(emphasis added).

Plaintiffs' evidence further showed Defendants worked tirelessly to ensure the industry adopted testing protocols not sensitive enough to detect asbestos in every talc sample. In the 1970s, Defendants recommended the FDA adopt their "J-41" method of testing for asbestos in cosmetic talc products. The J-41 method uses an x-ray diffraction instrument to detect asbestos in a talc sample. Only if the x-ray diffraction instrument detects an amphibole mineral is the talc sample is further analyzed under polarized light microscopy to determine whether asbestos is present.

Over several years, Defendants consistently found the Products contained no asbestos using the J4-1 method. However, another method for testing cosmetic talc for asbestos existed and Defendants knew it: the "pre-concentration method." The pre-concentration method separates talc particles from asbestos particles so imaging equipment can accurately display the amount of asbestos present in a talc sample. The process involves placing a talc sample in a heavy liquid and using a centrifuge to separate the talc particles from the asbestos particles. The talc particles float, while the asbestos particles sink. This technique prevents asbestos from "hiding" behind talc particles and enhances imaging equipment's ability to detect asbestos.

Defendants admitted in an internal company document that using "concentrating techniques w[ould] permit a good laboratory to identify asbestos or tremolite in a talc sample." And, in the early 1970s, Defendants used the pre-concentration method to test samples of their Products for asbestos and detected tremolite. But Defendants deliberately chose not to use the pre-concentration method when testing the Products for asbestos because they feared doing so would cause *too much* asbestos to be detected. Internal documents revealed Defendants decided

not to adopt the pre-concentration method because the pre-concentration method made it "possible to arrive at levels of detectability of asbestos in talc in the [parts per million] range" and would likely "be too sensitive."

Defendants then aggressively recommended the FDA adopt the J-41 method and not the pre-concentration method as the industry standard for asbestos testing in talc. Internal documents revealed Defendants did so to protect their own interests:

- "[I]t looks like the FDA is getting into separation and isolation methodology which will mean concentration procedures . . . . [T]here are many talcs on all markets which will be hard pressed in supporting purity claims, when ultra sophisticated assay separation and isolation techniques are applied. Chances are that this FDA proposal will open up new problem areas with asbestos and talc minerals."

- "We believe it is critical for the C.T.F.A. to now recommend [the J-41 method] to the F.D.A. before the art advances to more sophisticated techniques with higher levels of sensitization. We deliberately have not included a concentration technique as we felt it would not be in worldwide company interests to do this."

Plaintiffs adduced additional evidence that Defendants published articles downplaying the safety hazards associated with talc through deception without revealing their funding. For example, Defendants hid the fact they funded a 2008 article by Joshua Muscat and Michael Huncharek that concluded there is no indication cosmetic talc causes cancer. Plaintiffs also adduced evidence that Defendants attempted to discredit scientists who published or sought to publish unfavorable studies regarding their Products. For example, after Defendants learned the Dutch Consumer Organization reported asbestos in the Products in 1973, Defendants asked the Dutch Consumer Organization "not to make any publications about asbestos in baby powder[ ] before [Defendants] agreed with their findings." And, after the Mount Sinai School of Medicine published findings Defendants deemed "hostile" regarding asbestos in Johnson's Baby Powder in 1975, Defendants demanded those findings be "immediate[ly] removed" from materials being disseminated at an occupational health conference. The following year, Defendants pressured

70

Mount Sinai to retract the results of its study and issue a press release to that effect. Defendants noted Mount Sinai did so "reluctantly."

A reasonable inference from all this evidence is that, motivated by profits, Defendants disregarded the safety of consumers despite their knowledge the talc in their Products caused ovarian cancer. The jury, exercising its "right to determine credibility, weigh the evidence and draw justifiable inferences of fact," could have reasonably concluded it was highly probable Defendants' conduct "was outrageous because of evil motive or reckless indifference" based on this evidence. *See Peters*, 200 S.W.3d at 25.

Defendants' arguments to the contrary are unavailing. First, Defendants argue punitive damages were unwarranted because several studies and reports concluded their Products contained no asbestos. To support their argument, Defendants cite to a host of evidence presented in their case-in-chief that many public health agencies have found there is insufficient evidence to conclude cosmetic talc causes ovarian cancer; the FDA has found no warning labels should be required on cosmetic talc products; several epidemiological studies found no association between cosmetic talc and ovarian cancer; many any regulatory agencies and laboratories have found no asbestos in the Products; and Defendants' routine testing measures detected no asbestos in the Products. These arguments ask us to entertain evidence and inferences from the evidence contrary to the jury's verdict, defying our standard of review. *See Barron*, 529 S.W.3d at 800.

Second, Defendants contend their adherence to the J4-1 method for asbestos testing fully complied with and exceeded industry standards and, thus, could not rise to the level of "evil motive or reckless indifference to the rights of others." They argue "Plaintiffs' proposed concentration method has been known since the 1970s and no public-health agency has ever

71

adopted it, including EPA, NIOSH, OSHA, and U.S. Pharmacopeia"; thus, punitive damages are unwarranted. However, our Court has held "mere compliance with industry standards" is not enough to prevent a trial court from finding a plaintiff made a submissible case for punitive damages. *See Ellis v. Kerr-McGee Chemical, L.L.C.*, No. ED 74835, 1999 WL 969278, at *3-4 (Mo. App. E.D. Oct. 26, 1999) (holding a plaintiff made a submissible case for punitive damages in a negligence case despite a defendant's argument it complied with industry standards). Further, Plaintiffs adduced compelling evidence suggesting they improperly influenced the industry, causing it to adopt a deficient testing standard. A reasonable jury could find such actions outrageous. *See Blanks*, 450 S.W.3d at 403 (holding plaintiffs made a submissible case for punitive damages in a mass tort case where plaintiffs adduced evidence "the defendants hid information from regulators[ and] resisted regulatory changes).

Last, Defendants urge we must find no clear and convincing evidence exists that Defendants engaged in conduct that was outrageous because of evil motive or reckless indifference because other courts have so held in other cases where they were named defendants. They cite *Johnson & Johnson Talcum Powder Cases*, wherein the California Court of Appeals held the plaintiffs did not make a submissible case for punitive damages where no regulatory agency or scientific experts had drawn a causal connection between perineal talc use and ovarian cancer. 37 Cal. App. 5th 292, 333 (Cal. Ct. App. 2019). They also cite *In re Johnson & Johnson Talcum Powder Cases*, No. BC628228, 2017 WL 4780572, at *16 (Cal. Super. Oct. 20, 2017), wherein the Superior Court of California held the plaintiffs did not make a submissible case for punitive damages where the evidence they presented suggested no more than "an on-going debate in the scientific and medical community about whether talc more probably than not causes ovarian cancer."

These decisions are persuasive authority at best. "Out of state appellate decisions do not constitute controlling precedent in Missouri courts." *Grillo v. Glob. Patent Grp. LLC*, 471 S.W.3d 351, 356 (Mo. App. E.D. 2015) (alterations omitted) (quoting *Craft v. Philip Morris Cos., Inc.*, 190 S.W.3d 368, 380 (Mo. App. E.D. 2005)). "While cases from other jurisdictions 'can provide useful and insightful guidance,' they 'are not conclusive or binding precedent.'" *State v. McIntosh*, 540 S.W.3d 418, 425 n.5 (Mo. App. W.D. 2018) (quoting *State ex rel. Safety Roofing Sys., Inc. v. Crawford*, 86 S.W.3d 488, 493 n.4 (Mo. App. S.D. 2002)). Even so, the California cases are factually distinguishable. In both cases, no evidence was adduced that samples of Defendants' Products contained asbestos or Defendants sought to conceal this fact by persuading the industry to adopt the J-41 method rather than a pre-concentration testing method. Here, new evidence was adduced that samples of Defendants' Products contained asbestos and Defendants sought to persuade the industry to adopt the less sensitive J-41 method rather than a pre-concentration testing method. As outlined above, the evidence adduced in this trial showed clear and convincing evidence Defendants engaged in conduct that was outrageous because of evil motive or reckless indifference.

We hold Plaintiffs made a submissible case for punitive damages against Defendants. Therefore, the trial court did not err in overruling Defendants' motions for directed verdict and judgment notwithstanding the verdict.

Point IX is denied.

*X: Punitive Damages*

In their final point, Defendants argue the trial court erred in denying their motion to vacate or remit the jury's punitive damages award because the award violates due process under both the United States and Missouri Constitutions. Defendants argue the jury's $4.14 billion

punitive damages award is grossly excessive and arbitrary, furthering no legitimate purpose. Defendants also argue the jury's $4.14 billion punitive damages award impermissibly punished J&J for injuries to "nonparties."

Standard of Review

Appellate courts review constitutional challenges to a punitive damages award *de novo*. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). "[A]lthough the determination on punitive damages is 'a function primarily left for the jury,' we must ensure that the award does not infringe upon a defendant's constitutional rights.'" *Poage*, 523 S.W.3d at 522 (citing *Kelly v. Bass Pro Outdoor World, LLC*, 245 S.W.3d 841, 850 (Mo. App. E.D. 2007)). "Exacting appellate review ensures that an award of punitive damages is based upon 'an application of law, rather than a decisionmaker's caprice.'" *Campbell*, 538 U.S. at 418 (internal quotations omitted) (quoting *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001)).

Analysis

"Although compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker, they serve distinct purposes." *See Cooper Indus., Inc.*, 532 U.S. at 432; *Campbell*, 538 U.S. at 416. Where compensatory damages are imposed to "redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," punitive damages are imposed for purposes of "deterrence and retribution." *Campbell*, 538 U.S. at 416 (internal quotations and citations omitted). "Essentially, punitive damages are meant to 'serve the same purposes as criminal penalties.'" *Poage*, 523 S.W.3d at 520 (quoting *Campbell*, 538 U.S. at 417). Punitive damages awards, however, cannot be imposed without adherence to constitutional limitations. *Campbell*, 538 U.S. at 416. The Due Process Clause of

74

the Fourteenth Amendment prohibits grossly excessive damage awards. *Id.* "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417.

No "simple mathematical formula" exists to help us determine whether a punitive award is grossly excessive; "the relevant constitutional line is 'inherently imprecise.'" *Krysa v. Payne*, 176 S.W.3d 150, 156 (Mo. App. W.D. 2005) (quoting *Cooper Indus., Inc.*, 532 U.S. at 434-35). "To satisfy due process, the amount of punitive damages should reflect the extent of the defendant's offense and be related to the resulting actual or potential harm." *Blanks*, 450 S.W.3d at 410. To ensure a punitive damages award comports with due process, the United States Supreme Court has instructed appellate courts to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418 (citing *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

In weighing these guideposts, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 538 U.S. at 419 (alterations omitted) (citing *Gore*, 517 U.S. at 575). Reprehensibility of the defendant's conduct is determined by considering several factors, including whether:

> the harm caused was physical or economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the targets of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, deceit, or mere accident.

75

*Id.* (citing *Gore*, 517 U.S. at 576-77). In evaluating the reprehensibility of JJCI's actions, "we view the evidence and all reasonable inferences in the light most favorable to the verdict and disregard all contrary evidence and inferences." *Krysa*, 176 S.W.3d at 157.

We find there was significant reprehensibility in Defendants' conduct. The harm suffered by Plaintiffs was physical, not just economic. Plaintiffs each developed and suffered from ovarian cancer. Plaintiffs underwent chemotherapy, hysterectomies, and countless other surgeries. These medical procedures caused them to experience symptoms such as hair loss, sleeplessness, mouth sores, loss of appetite, seizures, nausea, neuropathy, and other infections. Several Plaintiffs died,[26] and surviving Plaintiffs experience recurrences of cancer and fear of relapse. All Plaintiffs suffered mentally and emotionally. Their ovarian cancer diagnoses caused them constant worry and fear.

After considering the substantial evidence presented by Plaintiffs that Defendants discussed the presence of asbestos in their talc in internal memoranda for several decades; avoided adopting more accurate measures for detecting asbestos and influenced the industry to do the same; attempted to discredit those scientists publishing studies unfavorable to their Products; and did not eliminate talc from the Products and use cornstarch instead because it would be more costly to do so, the jury found Defendants knew of the asbestos danger in their Products when they were sold to the public. This finding supports that Defendants' exposure of consumers to asbestos over several decades was done with reckless disregard of the health and safety of others.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S.

---

[26] During the pendency of this appeal alone, Plaintiffs Gail Ingham, Annette Koman, Toni Roberts, Andrea Lynn Schwartz-Thomas, and Olga Salazar have died. Suggestions of Death and Motions for Substitution were filed on their behalf, all of which were granted by this Court.

at 580. The United States Supreme Court has advised "a comparison between the compensatory award and the punitive award is significant." *Id.* However, there is no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* Instead, "[w]hether the disparity between punitive damages and the harm caused violates due process is determined on a case-by-case basis" and should be guided by "a general concern of reasonableness." *Poage*, 523 S.W.3d at 523 (first quotation); *Gore*, 517 U.S. at 583 (second quotation) (alterations omitted) (quoting *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 458 (1993)). "[T]he precise award in any case 'must be based on the peculiar facts and circumstances of the defendant's conduct and the harm to the plaintiff.'" *Blanks*, 450 S.W.3d at 411 (quoting *Campbell*, 538 U.S. at 425). "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425. "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1." *Id.* (citing *Gore*, 517 U.S. at 582).

Here, the jury awarded $550 million in actual damages ($25 million multiplied by twenty-two Plaintiffs) jointly and severally against Defendants. The jury recommended, and the trial court awarded, $990 million in punitive damages against JJCI and $3.15 billion against J&J, yielding ratios of 1.8:1 for JJCI and 5.72:1 for J&J.[27]

However, in Point III we held the trial court erred in exercising personal jurisdiction over JJCI on two Non-Resident Plaintiffs' claims and over J&J on all seventeen Non-Resident Plaintiffs' claims. "[A]ny judgment entered without personal jurisdiction over a party is void."

---

[27] We have calculated these ratios in accordance with the Missouri Supreme Court's approach in *Lewellen v. Franklin*, 441 S.W.3d 136 (Mo. banc 2014). In *Lewellen*, the court divided each individual punitive damages award by the entire actual damages award where defendants were jointly and severally liable for all actual damages.

*Focus Bank*, 504 S.W.3d at 907.  Therefore, JJCI is liable for $500 million in actual damages ($25 million multiplied by twenty Plaintiffs) and J&J is jointly and severally liable for $125 million in actual damages with JJCI ($25 million multiplied by five Plaintiffs).

Given our reduction of actual damages, we must reduce the punitive damages awards against Defendants proportionally to "reflect the ratio of punitive to actual damages assessed originally by the trial court."  *See Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 586-87 (8th Cir. 1981) (reducing punitive damages awards proportionally to reflect the reduction of actual damages awarded to plaintiffs); *see also Senn v. Manchester Bank of St. Louis*, 583 S.W.2d 119, 138-39 (Mo. banc 1979) (same).  This approach ensures the original judgment of the jury is given effect, while excessive damage awards are avoided.  *Ogilvie*, 641 F.2d at 587.

Because we determined there is personal jurisdiction over JJCI on twenty of the twenty-two Plaintiffs' claims, we reduce the punitive damages award against JJCI to $900 million.  Because we determined there is personal jurisdiction over J&J on five of the twenty-two Plaintiffs' claims, we reduce the punitive damages award against J&J to $715,909,091.[28]  The adjusted actual damages amounts and punitive damages amounts yield ratios of 1.8:1 for JJCI and 5.72:1 for J&J.  These ratios, as adjusted, are well within the limits of punitive damages consistently upheld.  *See e.g.*, *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 661 (Mo. App. W.D. 1997), overruled on other grounds by *Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013) (upholding a 3:1 ratio); *Poage*, 523 S.W.3d at 523-24 (upholding a 6:1 ratio); *Mansfield v. Horner*, 443 S.W.3d 627, 645-46 (Mo. App. W.D. 2014) (upholding a 11:1 ratio); *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (upholding a 4:1 ratio); *Gibson v. Moskowitz*, 523 F.3d 657, 665 (6th Cir. 2008) (upholding a 2:1 ratio); *Brand*

---

[28] This figure has been rounded to the nearest dollar amount.

*Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 366 (3d Cir. 2015) (upholding a 5:1 ratio).

Defendants claim a punitive damages ratio of 1:1 is the "outermost" constitutional limit in cases where the jury has awarded "substantial damages." Defendants cite several federal appellate decisions that have remitted punitive damages awards from higher ratios to a 1:1 ratio when "substantial" compensatory damages were awarded. *See e.g.*, *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041 (10th Cir. 2016); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594 (8th Cir. 2005); and *Morgan v. New York Life Ins. Co.*, 559 F.3d 425 (6th Cir. 2009). However, "[w]hile an appellate court can look to other decided cases for guidance, they are often not determinative, for each case presents its own peculiar facts and circumstances which must be evaluated." *Barnett*, 963 S.W.2d at 661.

The United States Supreme Court has stated, "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 (2008) (internal alterations and quotations omitted). However, the Court has also emphasized "there are no rigid benchmarks that a punitive damages award may not surpass." *Campbell*, 538 U.S. at 425; *see also TXO Prod. Corp.*, 509 U.S. at 462 (upholding a ratio as high as 526:1). We find the ratios of 1.8:1 for JJCI and 5.72:1 for J&J appropriate, given the facts and circumstances before us.

"High-ratio punitive damage awards are sometimes necessary in order to have a sufficient deterrent effect." *See Blanks*, 450 S.W.3d at 411. Indeed, "[a] much larger amount of punitive damages is required to have a deterrent effect on a multi-billion dollar corporation than a smaller business." *Poage*, 523 S.W.3d at 524. "[A] larger punitive damages award is justified to

promote Missouri's legitimate interest of deterring companies from putting unreasonably dangerous products into our State's stream of commerce." *Id.*

Because Defendants are large, multi-billion dollar corporations, we believe a large amount of punitive damages is necessary to have a deterrent effect in this case. However, based on the evidence, we believe a larger amount of punitive damages is needed to deter J&J's conduct than JJCI's conduct. While both corporations are multi-billion dollar corporations, J&J's net worth is considerably larger than JJCI's net worth. At trial, Defendants stipulated JJCI's net worth is $13.3 billion and J&J's net worth is $63.2 billion. Furthermore, Defendants' decision to chart their course of reprehensible conduct began with J&J long before JJCI was spun off as a separate entity in 1979 and engaged in reprehensible conduct of its own. Given this evidence, the higher ratio of 5.72:1 for J&J is justified.

"Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect." *Id.*; *see also Gore*, 517 U.S. at 582 ("A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."). It is impossible to place monetary value on the physical, mental, and emotional anguish Plaintiffs suffered because of their injury caused by Defendants. In addition, Plaintiffs adduced evidence ovarian cancer can take many years to develop after exposure to an asbestos-containing product. The time between the use of Defendants' asbestos-containing Products and the manifestation of symptoms of ovarian cancer makes it difficult to detect the harm they suffered. *See Poage*, 523 S.W.3d at 524. Given these facts and circumstances, the ratios of 1.8:1 for JJCI and 5.72:1 for J&J are reasonable and comply with due process.

Under the third guidepost, we must evaluate "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" *Campbell*, 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575). However, as the parties agree, "violations of common law tort duties often do not lend themselves to a comparison with statutory penalties." *See Lompe*, 818 F.3d at 1070; *see also Campbell v. State Farm Mut. Auto. Ins. Co.*, 98 P.3d 409, 419 (Utah 2004) ("[T]he quest to reliably position any misconduct within the ranks of criminal or civil wrongdoing based on penalties affixed by the legislature can be quixotic."). Accordingly, "This factor 'is accorded less weight in the reasonableness analysis than the first two guideposts.'" *Krysa*, 176 S.W.3d at 163 n.7 (quoting *Kemp v. Am. Tel. & Tel., Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004)).

"[T]he Missouri legislature has authorized . . . civil and criminal sanctions for cases of fraud and concealment." *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000). For example, section 407.100.6 authorizes a civil penalty of up to $1,000 for each violation, and section 407.020.3 provides that a person who "with the intent to defraud," willfully and knowingly engages" in any violation of the MMPA is guilty of a class E felony, which is punishable by up to four years in prison and a fine of up to $10,000. *Id.* (citing §§ 407.100.6, 407.020.3); *see also* § 558.002.1(1) (providing "a person who has been convicted of an offense may be sentenced to pay a fine which does not exceed . . . ten thousand dollars[.]"); § 558.011.1(5) (providing the term of imprisonment for a class E felony cannot exceed four years). The punitive damages awards here, as adjusted, are significantly larger than the penalties authorized under the MMPA. However, this is not dispositive in our analysis of whether the punitive damage awards against Defendants are grossly excessive. *See Lewellen v. Franklin*, 441 S.W.3d 136, 148 (Mo. banc 2014) (finding a $2 million punitive damages award was not grossly

excessive despite the fact the punitive damages award exceeded the penalties authorized under the MMPA).

Considering all three guideposts, we find the punitive damages awards assessed against Defendants, as adjusted, are not grossly excessive considering Defendants' actions of knowingly selling Products that contained asbestos to consumers. "Under Rule 84.14, this Court may enter the judgment the trial court should have entered." *City of De Soto v. Nixon*, 476 S.W.3d 282, 291 (Mo. banc 2016); *see also* Rule 84.14. Accordingly, we enter judgment for $500 million in actual damages against JJCI and $125 million in actual damages against J&J jointly and severally with JJCI. We further enter judgment for $900 million in punitive damages against JJCI and $715,909,091 in punitive damages against J&J.

Point X is denied as modified.

## Conclusion

The judgment against JJCI is reversed in part on the claims of the two Non-Resident Plaintiffs, Allan Koman on behalf of Annette Koman and Marcia Owens, who only used Johnson's Baby Powder and denied using Shimmer for lack of personal jurisdiction. The judgment against J&J is reversed in part as to all seventeen Non-Resident Plaintiffs for lack of personal jurisdiction.

Because no further adjudication is necessary, this Court may give such judgment as ought to be given under Rule 84.14. *See Nixon*, 476 S.W.3d at 291. Accordingly, this Court enters judgment under Rule 84.14 against JJCI for $500 million in actual damages and J&J for $125 million jointly and severally with JJCI to reflect the proportional loss of the two Non-Resident Plaintiffs from JJCI's actual damages award and the proportional loss of the seventeen Non-Resident Plaintiffs from J&J's actual damages award, as discussed in Point III. We further enter

82

judgment under Rule 84.14 against JJCI for $900 million in punitive damages and against J&J for $715,909,091 in punitive damages to reflect the proportional loss of the two Non-Resident Plaintiffs from JJCI's punitive damages award and the proportional loss of the seventeen Non-Resident Plaintiffs from J&J's punitive damages award. In all other respects, the judgment is affirmed as modified.

_____
Philip M. Hess, Presiding Judge

Kurt S. Odenwald, J. and
Lisa P. Page, J. concur.